Peter HUANG, et al., Plaintiffs,

v.

SENTINEL GOVERNMENT SECURITIES, et al., Defendants.

George SCHARFFENBERGER, et al., Plaintiffs,

v.

SENTINEL GOVERNMENT SECURITIES, et al., Defendants.

Nos. 85 Civ. 8607 (PKL), 86 Civ. 3370 (PKL).

United States District Court, S.D. New York.

March 28, 1989.

Chadbourne & Parke, Laurence Jackson, Los Angeles, Cal., for plaintiffs.

Lord Day & Lord, Barrett Smith, Warren H. Colodner, Sandra J. Mullings, New York City, for defendant Lasser Marshall Inc.

Ernest H. Hammer, New York City, for defendant William Allen.

Paul, Weiss, Rifkind, Wharton & Garrison, Mark H. Alcott, David G. Bookbinder, New York City, for defendant Gill & Duffus Securities, Inc.

Herrick, Feinstein, Susan T. Dwyer, New York City, for defendant Joseph J. Vitrella.

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiffs in these consolidated actions are former owners of limited partnership interests ("units") in defendant Sentinel Government Securities ("SGS"). The action is presently before the Court on the motions of defendants Lasser Marshall Inc. ("LMI"), Gill & Duffus Securities, Inc. ("Gill & Duffus"), William Allen ("Allen"), and Joseph J. Vitrella ("Vitrella") (collectively "the moving defendants") to dismiss The First Amended Consolidated Complaint

(the "Complaint"), or in the alternative, for summary judgment under Fed.R.Civ.P. 56.[1]

These actions arise out of the defendants' allegedly fraudulent and criminal sham trading of government securities, and a variety of related fraudulent bookkeeping transactions. The activities are said to violate the Securities Act of 1933 (" '33 Act"), the Securities Exchange Act of 1934 (" '34 Act"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and to constitute fraud and negligence under state law. The moving defendants raise a variety of challenges to the sufficiency and timeliness of the claims made in the Complaint.

## BACKGROUND

The plaintiffs in these actions purchased SGS units in November, 1980. A private placement memorandum and related offering materials (collectively the "Offering Memorandum") was prepared by SGS and certain of its officers, employees and agents, and distributed to plaintiffs prior to the November, 1980 purchases. That Offering Memorandum included discussion of possible tax benefits associated with the SGS investments, and described SGS's prospective trading activities in the secondary market for interest sensitive instruments such as Treasury bills, bonds and notes. Complaint ¶ 19. The profits and potential tax savings would be accomplished through the use of "hedging" techniques, and arbitrage agreements involving repurchase and reverse purchase agreements.

Plaintiffs assert that the tax-advantage trading described in the Offering Memorandum never occurred, and the trading activity purportedly undertaken by SGS was not *bona fide*. It is alleged that, at the time the Offering Memorandum was made, the defendants did not ever intend to conduct legitimate trading at all, but knew of, and planned, the fake trading scheme. SGS is alleged to have made these sham transactions, after the plaintiffs' purchase of the

partnership interests, with the assistance of LMI and Gill & Duffus. Complaint ¶ 21.

On November 17, 1981, agents acting on behalf of the United States Attorney for the Southern District of New York (the "government") seized virtually all of the business documents of SGS pursuant to a search warrant. The warrant was issued in connection with a criminal investigation of SGS and related entities. The managing general partner of SGS, Michael Senft ("Senft"), was a major participant in the alleged activities, and a primary target of those Government investigations. Throughout the continuing investigation of SGS and its related entities, Senft issued communications and made representations to the plaintiffs and the other limited partners. Complaint ¶ 23. SGS initially stated to the limited partners that the government was "reviewing" the papers, apparently in relation to "tax consequences of transactions" undertaken by SGS. Affidavit of Eric W. Berry, Esq., sworn to on December 19, 1986 ("Berry Affidavit"), Exhibit B. The stated position of SGS was that it was attempting to secure the return of seized records. Berry Affidavit, Exhibit E. As late as June of 1982, SGS informed the plaintiffs that it was "making efforts … to recover the documents seized by the government." Berry Affidavit, Exhibit F at 004175.

In the ensuing weeks, SGS unsuccessfully attacked the legality of the search and seizure of its records. After oral argument, the challenge to that warrant was rejected in a January 5, 1982 opinion issued by Honorable Charles S. Haight, United States District Judge of this Court. That opinion noted probable extensive criminal activities by SGS and a related company, Sentinel Financial Instruments ("SFI"). The opinion did not mention any of the moving defendants, or any other possibly involved parties. Berry Affidavit, Exhibit C. Subsequent challenges to the seizure were similarly rejected by the Court. The position of SGS continued to be that the

---

**1.** This Court previously granted defendant Mercantile House Holding plc's Fed.R.Civ.P. 12 motion to dismiss for lack of personal jurisdiction. *Huang v. Sentinel Government Securities,* 657 F.Supp. 485 (S.D.N.Y.1987). Judgment to that effect was entered, pursuant to Fed.R.Civ.P. 54(b), on May 20, 1987.

criminal investigation was unfounded, and that the transactions of SGS had been *bona fide* and legitimate. *See,* Berry Affidavit, Exhibits B, D, E, and F.

On or about June 17, 1982, SGS sent a Redemption Offer Proposal to its limited partners, including plaintiffs, by which it offered to redeem all SGS limited partnership units for 10% of the original cash invested per unit, plus cancellation of all SGS Notes (the "Redemption Offer"). Complaint ¶ 25. The transmittal letter and memorandum that accompanied the redemption offer included various acknowledgments of the criminal actions apparently being instituted against SGS, and noted that a "government securities firm which was one of the Partnership's trading counterparts" was unwilling to confirm or deny substantial transactions with SGS. Berry Affidavit, Exhibit F at 004158. The present plaintiffs eventually redeemed their partnership units.

In November, 1983, Senft and other individuals involved with SGS and SFI were indicted for tax fraud and related offenses. The charges encompassed the business transactions of SGS enumerated in the present Complaint, and LMI and Gill & Duffus were identified in an "overt acts" section of the indictment. Declaration of Ellen J. Gleberman, Esq., sworn to on March 5, 1987 ("Gleberman Decl."), Exhibit D. Convictions on certain of those charges were obtained against various of the criminal defendants, but none were obtained or sought against the moving defendants herein. The jury hung on the specific counts involving SGS. Vitrella and Allen, former officers of LMI, testified at trial in exchange for grants of immunity from the government.

The Internal Revenue Service subsequently determined that the SGS transactions challenged in the indictment were not sufficient to allow the plaintiffs the tax benefits, namely claimed losses and offsetting capital gains, that they had asserted for 1980, 1981 and 1982.

Plaintiffs commenced the instant action, *Huang, et al. v. SGS et al.,* No. 85 Civ. 8607 (PKL), in this Court on October 31, 1985. The California plaintiffs originally filed their complaints, *Scharffenberger, et al. v. SGS et al.,* and *Cowling, et al. v. SGS, et al.,* in the United States District Court for the Central District of California, on September 23, 1985 and November 22, 1985. The California actions were transferred to this Court, and the *Scharffenberger* and *Huang* actions were consolidated in the Complaint that is the subject of these motions. The *Cowling* action was subsequently consolidated with the other actions by stipulation and order filed on March 2, 1987.

DISCUSSION

The present motions raise a variety of challenges to the plaintiffs' actions. Generally, these include: 1) the sufficiency of the federal securities law claims stated in the complaint, including both Section 10(b) of the '34 Act and Section 17(a) of the '33 Act, 2) the sufficiency of the stated RICO claims, 3) the sufficiency of the state law claims for negligent misrepresentation, 4) statute of limitations issues on the federal and state law claims, and 5) this Court's jurisdiction over the state common law claims.[2]

STANDARDS

The defendants have moved for dismissal under Fed.R.Civ.P. 12, or alternatively for summary judgment under Fed.R.Civ.P. 56(c). On a motion to dismiss, the complaint must be read generously, and every favorable inference drawn in favor of the plaintiffs. *Pross v. Katz,* 784 F.2d 455, 457 (2d Cir.1986); *Metzner v. D.H. Blair & Co., Inc.,* 663 F.Supp. 716, 719 (S.D.N.Y.1987). The complaint should only be dismissed if it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Stone v. Chung Pei Chemical Industry Co., Ltd,* 790 F.2d 20, 22 (2d Cir.1986). The Court must, in fact,

---

**2.** The sufficiency of the stated claims for common law fraud are not challenged in these motions.

"determine whether the facts set forth justify taking jurisdiction on grounds other than those most artistically pleaded." *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 558 (2d Cir.1985) (citations omitted).

Summary judgment may be granted pursuant to Fed.R.Civ.P. 56(c) where "there are no unresolved factual disputes as to issues material to the outcome of the litigation." *The King Service, Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 295 (2d Cir.1987).

The substantive law governing the case will determine those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court's function in a summary judgment motion is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. *See also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir.1989); *Heyman v. Commerce & Indus. Ins.*, 524 F.2d 1317 (2d Cir.1975).

The defendants here bear the initial burden of informing the Court of the nature and basis of their motions, and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which they believe demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The moving parties are not required, however, to produce "affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (emphasis in original). *See generally*, Schwarzer, Summary Judgment under the Federal Rules: Defining Genuine Issue of Material Fact, 99 F.R.D. 465, 487–88 (1984). The burden is discharged by " 'showing'—that is, point-ing out to the District Court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

When this initial showing is made, it becomes the non-moving party's burden "to set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511; *King Service Inc.*, 834 F.2d at 295. In ascertaining whether there are material issues to be tried, the Court must "resolv[e] ambiguities and draw[ ] reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see also Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985). If a material factual issue may only be determined by a *trier* of fact, namely, if the material issue could reasonably be resolved in favor of either party, summary judgment is not proper.

The non-moving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). *See also, King Service Inc. v. Gulf Oil Corp.*, 834 F.2d 290, 294–95 (2d Cir.1987); *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989); *Rosenthal v. Kingsley*, 674 F.Supp. 1113, 1115 (S.D.N.Y.1987). Additionally, disagreement as to "ultimate facts or conclusions" will not make summary judgment by the Court improper, where the material facts pertinent to the movant's motion are not legitimately disputed. *Burroughs Wellcome Co. v. Commercial Union Insurance Co.*, 642 F.Supp. 1020, 1022 (S.D. N.Y.1986).

## 1. Federal Securities Law Claims.

### A. Section 17(a).

■ This Court has now taken the position, in accord with recent and ever-increasing case authority, that there is no private

right of action under Section 17(a) of the '33 Act. *See, e.g., Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 559 n. 3 (2d Cir.1985) (Friendly, J.); *Dubin v. E.F. Hutton Group, Inc.,* 695 F.Supp. 138 (S.D.N.Y.1988). *See also, Eickhorst v. American Completion and Development Corporation,* 706 F.Supp. 1087 (S.D.N.Y.1989) ("[T]he Court is aware of no recent voice substantively arguing the correctness of the conclusion that section 17(a) carries with it an implied private right of action.") Consequently, plaintiffs' claims against the defendants based upon § 17(a) are hereby dismissed.

### B. Section 10(b).

The moving defendants raise two related, analytically intertwined challenges to the Section 10(b) claims. The factual basis of the Complaint's Section 10(b) claims involves the December 1980 sale of the partnership units to the plaintiffs. The moving defendants assert that their allegedly fraudulent activities largely post-date that Offering, and in any event; 1) did not occur "in connection with" the sale of those securities, and 2) had no causal relationship to the plaintiffs' losses. Even giving the Complaint its broadest possible import, and resolving any doubts as to the existence of material factual issues in favor of the plaintiffs in accord with the standards set out above, the Court must agree that no Section 10(b) claim can be stated against the moving defendants.

▮ The alleged sham transactions between the moving defendants and SGS cannot, themselves, support a Section 10(b) claim. All of those transactions occurred *after* the December 1980 purchases of the partnership units. Complaint ¶ 39. Such post-purchase activities have consistently and explicitly been rejected as bases for Section 10(b) liability. *See, e.g., Rothstein v. Seidman & Seidman,* 410 F.Supp. 244 (S.D.N.Y.1976); *Halperin v. Edwards & Hanly,* 430 F.Supp. 121, 123–25 (E.D.N.Y. 1977); *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1088 (N.D.Cal. 1979).

▮ The closer question involves those portions of the Complaint which charge that, "prior to the date Plaintiffs purchased their Units," the moving defendants had meetings and an "arrangement" with SGS to undertake the fraudulent trading scheme. Additionally, certain principals of the moving defendants are alleged to have had knowledge of the Offering Memorandum. *See, generally,* Complaint ¶¶ 37, 38; Criminal Trial Testimony of Vitrella and Allen, attached as Exhibits B & C to Gleberman Decl., respectively. These allegations do not suffer from the clear temporal deficiency of the sham transactions themselves. *See Zuckerman v. Harnischfeger Corp.,* 591 F.Supp. 112, 121 (S.D.N.Y.1984). The issues, however, are whether these alleged activities constitute the "substantial assistance" necessary to create Section 10(b) liability, *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983), and whether these activities have the requisite causal nexus to the plaintiffs' losses. *See generally Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 n. 23 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

Plaintiffs argue that the subject of the alleged agreements was so intertwined with, and part of, a unified fraudulent scheme, that connection and causation necessarily had to exist. This argument blurs the distinction between the two distinct frauds alleged in this suit. There were fraudulent statements made in the Offering Memorandum, with which the moving defendants had no association, but which clearly were "in connection with" the purchase or sale of a security, and caused losses that arose from those purchases. There were also substantive frauds that involved the sham trading transactions, which did involve the moving defendants, but which occurred *after* the securities were acquired. Plaintiffs seek to tie the later frauds to the former through the alleged pre-purchase agreements and knowledge, and thereby create a Section 10(b) action against the moving defendants.

This approach would read the causation and connection requirements out of the se-

curities laws. *See Kaliski v. Hunt Intern. Resources Corp.*, 609 F.Supp. 649, 653 (N.D.Ill.1985) ("[N]o independent cause of action exists under the securities laws ... for civil conspiracy."); *Hudson v. Capital Management Intern. Inc.*, 565 F.Supp. 615, 622 (N.D.Cal.1983); *Wittenberg v. Continental Real Estate Partners Ltd.*, 478 F.Supp. 504, 509 (D.Mass.1979), *aff'd*, 625 F.2d 5 (1st Cir.1980). The pre-purchase agreements and knowledge that plaintiffs urge as a bases for their Section 10(b) claims must *independently* constitute the "substantial assistance in the primary wrongdoing" required for primary or secondary liability under the securities laws. *Armstrong, supra*, 699 F.2d at 91.

Turning to those pre-purchase activities, it is apparent on the present record that they could not, as a matter of law, support a claim under Section 10(b). Although the "in connection with" phrase is construed broadly by the courts, *United States v. Newman*, 664 F.2d 12, 18 (2d Cir.1981), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), the preliminary discussions here, even if they resulted in a firm commitment that the moving defendants would serve as trading partners to SGS, would not amount to the required substantial assistance. *Mendelsohn v. Capital Underwriters*, 490 F.Supp. 1069, 1083–84 (N.D.Cal.1983). *See also, Dept. of Economic Dev. v. Arthur Andersen Co.*, 683 F.Supp. 1463, 1478–79 (S.D.N.Y.1988). There is no allegation of any direct contact at all between the moving defendants and the plaintiffs, of any involvement by the moving defendants in the preparation of the Offering Memorandum, of any reliance by the plaintiffs on the moving defendants' reputation, or of trading by SGS on the basis of that reputation.[3] *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir.1985); *Dept. of Economic Dev., supra*, 683 F.Supp. at 1478.

The preliminary discussions and agreements could not have constituted the "loss causation" that is required in this Circuit. *See Manufacturers Hanover Trust v. Drysdale Sec. Corp.*, 801 F.2d 13, 20 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). The losses claimed by plaintiffs were caused by their reliance on the fraudulent statements in the Offering Memorandum. The only way that those losses might have been "caused" by the alleged discussions and agreements of the moving defendants would be in a "but for" sense, and such "but for" causation is clearly insufficient to state a Section 10(b) claim. *Chemical Bank, supra*, 726 F.2d at 943.

Additionally, in no sense could the remote pre-purchase activities have contributed to the required "transaction causation— that the violations in question caused the [plaintiff] to engage in the transaction in question." *Schlick v. Penn–Dixie Cement*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). *See also, Wilson v. Ruffa & Hanover, P.C.*, 844 F.2d 81, 85 (2d Cir.1988); *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 313 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

In short, the plaintiffs cannot state a claim for relief under Section 10(b). Summary judgment on those claims arising under Section 10(b) is therefore granted in favor of the moving defendants.

*2. RICO Claims.*

 Gill & Duffus raises a challenge to the sufficiency of the second RICO claim in the complaint.[4] While not seriously con-

---

**3.** Plaintiffs assert, in fact, that they did not have any knowledge of the moving defendants' identity until three years after the purchases of the partnership units, and a year after those units were sold. *See, e.g.,* Declaration of William S. Cowling, II, sworn to on February 2, 1987, ¶ 4.

**4.** Although this particular RICO standing argument is made by Gill & Duffus, the moving defendants join in each other's motions. For clarity, however, the Court here will refer to the argument as one made by Gill & Duffus.

testing the substantive validity of the RICO claims as pleaded, Gill & Duffus asserts that the plaintiffs lack standing to make claims for the losses that are the basis of the second RICO Count, or the Eleventh Cause of Action. Complaint ¶¶ 84–92. Those losses, in that they relate to lost tax benefits, are argued actually to be the losses of the Internal Revenue Service. The plaintiffs, then, are argued not to be the "real party in interest" under Fed.R.Civ.P. 17(a). *See,* Memorandum of Gill & Duffus Securities in Support of Motion to Dismiss the Complaint ("Gill & Duffus Mem."), at pp. 22–26. These arguments are without merit.

In this regard, Gill & Duffus relies on *Carter v. Berger,* 777 F.2d 1173 (7th Cir. 1985), which dismissed a taxpayer suit pursuant to Fed.R.Civ.P. 17, on the ground that the taxpayer plaintiffs were not the real parties in interest. *Carter* has no bearing on the issues presented by this lawsuit; it is more analogous to general taxpayer standing suits which properly deny recovery for indirect, attenuated injury. The injuries alleged in the Complaint are direct injuries to the present plaintiffs, caused by the alleged frauds involving the moving defendants. The gravamen of the plaintiffs' case is that SGS and the moving defendants deprived the plaintiffs of the value of their investment, which included certain tax consequences, through engaging in the fraudulent trading scheme.

Unlike *Carter,* the plaintiffs here are not suing an unrelated wrongdoer, do not have a direct and legally cognizable claim against the government, and do allege direct injuries resulting from the moving defendants' fraudulent scheme. The mere fact that the defendants' fraudulent scheme involved investments with stated tax implications does not remove the plaintiffs from the protection afforded under the RICO statute. The Internal Revenue Service was an instrumentality through which the defendants allegedly accom-

plished their fraud; it was not the primary victim of that fraud nor the real party in interest. *See County of Suffolk v. Long Island Lighting Co.,* 685 F.Supp. 38, 39 (E.D.N.Y.1988). The plaintiffs have standing to bring their RICO claims.

### 3. Negligent Misrepresentation.

The moving defendants also raise a standing-type challenge to the negligent misrepresentation claims. Essentially, the defendants argue that plaintiffs are required, under both New York and California law, to have a relationship approaching that of privity with the defendants to be able to state a claim for negligent misrepresentation. Defendants assert that plaintiffs cannot show such a relationship.

There are both New York and California plaintiffs in these consolidated actions; the parties agree, and this Court assumes, that the law from the respective states applies to the plaintiffs from those states. *See Gelb v. Royal Globe Insurance Co.,* 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).[5]

### A. New York Plaintiffs.

■ The most recent comprehensive discussion of negligent misrepresentation by the New York Court of Appeals was in *Credit Alliance Corp. v. Arthur Andersen,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). That case discussed and elaborated on the standards for the tort in New York, as previously enumerated in *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977) and the seminal case of *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). Proper application of those standards indicates that the Complaint alleges a sufficient relation to support a negligent misrepresentation claim, and the claims cannot be dismissed as a matter of law.

---

**5.** The New York plaintiffs in these actions are: Peter Huang, Stephen O'Neil and Birch Associates.

The California plaintiffs are: John McHugh, Agostino Guidi, Birch Associates, George Scharf-

fenberger, Frank Moothart, Continental American Properties, Korn Ferry 1972, William S. Cowling II, Elliott L. Cushman, Stephen P. Cushman, Lawrence M. Cushman, Bond Land Company, Pat O. Daily and John Thornton.

The required relationship between a plaintiff and a defendant in a negligent misrepresentation action is one " 'approach[ing] that of privity.' " *Credit Alliance*, 65 N.Y.2d at 546, 493 N.Y.S.2d at 440, 483 N.E.2d at 115 (*quoting Ultramares*, 255 N.Y. at 182–83, 174 N.E. 441). The thrust of the moving defendants' argument is that such a relationship cannot exist in the absence of allegations of direct communications between the defendants and plaintiffs.[6] The applicable standard in New York does not, however, impose a rigid requirement of direct communication.

The touchstone of the inquiry is not, as the moving defendants claim, formal direct communication, but rather some link of the "defendant to plaintiff which evinces defendant's understanding of plaintiff's reliance." *Eiseman v. State*, 70 N.Y.2d 175, 188, 518 N.Y.S.2d 608, 614, 511 N.E.2d 1128, 1135 (1987) (citations omitted). *See also William Iselin & Co., Inc. v. Landau*, 71 N.Y.2d 420, 425, 527 N.Y.S.2d, 176, 178, 522 N.E.2d 21, 23 (1988). The policy underlying the evolving privity-type requirement of *Ultramares* and its progeny is the necessity of some limitation on potentially unlimited liability, in those particular cases by defendant accounting firms, to any person who sees or relies on a financial statement prepared or reviewed by the defendant. The courts have "limited the universe of permissible plaintiffs because a failure to do so would impose a duty of reasonable care enforceable by any member of an indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured by any negligence." *Eiseman, supra,* 70 N.Y.2d at 188, 518 N.Y.S.2d at 614, 511 N.E.2d at 1135. *See, First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 434 (S.D.N.Y.1986).

In the present case, it is alleged that the negligently misrepresented trade confirmations prepared by the moving defendants were transmitted to SGS only, for the exclusive use of SGS, its auditors, and its limited partners. These trade confirmations were prepared for only this purpose, and would not have been relied upon by some indeterminate class. In this case the relationship "between the limited partnership and the [defendant] rendered the beneficiaries both identifiable and fixed in number. 'Here, the services of the [defendant] were not extended to a faceless or unresolved class of persons, but rather to a known group possessed of vested rights, marked by a definable limit.' " *Widett v. U.S. Fidelity and Guaranty Co.*, 815 F.2d 885, 886 (2d Cir.1987) (*quoting White, supra,* 43 N.Y.2d at 361, 401 N.Y.S. at 477, 372 N.E.2d at 318).

Under the deferential dismissal and summary judgment standards which the Court must apply to the plaintiffs' Complaint and the claims under it, it is clear that the negligent misrepresentation claims under New York law should not now be dismissed.

**B. California Plaintiffs.**

The differences between California and New York law with regard to actions for negligent misrepresentation are not substantial. As this Court stated in *First Fed. Sav. & Loan v. Oppenheim, Appel, Dixon,* 629 F.Supp. 427, 434–35 (S.D.N.Y.1986) (footnote omitted):

> Because we read the New York law as imposing requirements for a negligence cause of action against accountants at least as stringent as the corresponding California law on the duty of care owed by a professional to a third party absent

---

**6.** The cases cited by both parties involve, for the most part, accountant defendants. Plaintiffs alternatively argue that the standards developed in those cases should be inapplicable to the trading house defendants here. As indicated in the following discussion, however, even applying the legal standards that contemplate more typical accounting firm defendants, the negligent misrepresentation claims in the Complaint should not be dismissed.

The analogy between trading house defendants and accounting firms is clearly very useful, and privity concepts do have general application. If there is a basis to differentiate, however, it would involve the more restricted scope of trading house activities, which would thus indicate less strict privity requirements for liability on the moving defendants' part.

contractual privity, an extended treatment of the California case law is not warranted. It suffices to state that by passing muster under the *Credit Alliance* standards, the plaintiffs' claim for negligent misrepresentation also states a cause of action against [defendant] under California law.

The parties argue the import of *Christiansen v. Roddy*, 186 Cal.App.3d 780, 785–86, 231 Cal.Rptr. 72 (1986), which was a discussion by the California Supreme Court of negligent misrepresentation in that state. There is no substantial difference between the torts in the two states, however, or in the policies implicated by the respective laws. The Complaint alleges a sufficient relationship to establish standing on the California plaintiffs' part for the negligent misrepresentation claims.

### 4. Statutes of Limitations.

█ Statutes of limitations challenges are asserted by the moving defendants to various claims. While the different claims involve individual limitation periods, the threshold issue in each case is when the claims can be said to have accrued.

The parties are in basic agreement over the proposition that the various statutes of limitation began to run when the "plaintiff[s] [had] actual knowledge of the alleged fraud or knowledge of the facts which in the exercise of reasonable diligence should have led to actual knowledge." *Stull v. Bayard*, 561 F.2d 429, 432 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978). *See also Cerbone v. Internat'l Ladies' Garment Workers Union*, 768 F.2d 45, 48 (2d Cir.1985). Although state law may determine the applicable limitations period, fed-

eral law determines when the period begins to run. *Stull, supra*, 561 F.2d at 432; *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977).

The parties strenuously disagree, however, as to when those statutes actually began to run. The essence of the dispute concerns when reasonable diligence would have led to knowledge sufficient to halt equitable tolling of the statutes.[7] The burden on the moving defendants, again, is a heavy one. They must establish the running of the statute as a matter of law, and that established duty to know of the frauds cannot be dependent upon genuine factual issues or tenuous inferences. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir.1979) ("Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences that must be drawn in determining intent and good faith."); *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973).

The moving defendants claim that the limitations periods began to run against all defendants, as a matter of law, no later than June of 1982. At that time SGS made the Redemption Offer for the outstanding partnership interests.[8] The Redemption Offer made it clear that SGS was the target of a criminal investigation, that one or more of its principals was likely to be indicted, and that one or more unnamed securities firms had become unwilling to conduct further business with SGS. The materials do not identify any of the moving defendants, and continued to formally express the position that SGS and its principals had committed no wrongdoing. *See generally* Berry Affidavit, Exhibit F.

---

**7.** Establishment of *actual* knowledge on the plaintiffs' part in the present case is too inherently factual to provide a basis for dismissal. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir.1979); *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973) ("We have repeatedly stated that summary judgment is particularly inappropriate where, as here, it is sought on the basis of the 'inferences which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions.'") (citations omitted).

**8.** The moving defendants argue that various additional pre-Redemption Offer activities contributed to the duty of the plaintiffs to discover the frauds by the moving defendants. These activities included letters from Senft to the limited partners, related civil actions, and the maneuvering of SGS and its principals in this Court in connection with the criminal investigation. LMI and Gill & Duffus were not identified, nor was the sham nature of the trading scheme revealed, in these letters and proceedings.

Plaintiffs cannot seriously contend that a duty to be aware of the frauds *by SGS* and its principals could not have arisen prior to at least June, 1982. That is not the issue presented by these motions, however; the issue involves the duty of the plaintiffs to know the identity of the trading house defendants, and something about their activities in relation to SGS. The moving defendants argue that there were sufficient "red flags" to impose such a duty in 1982. There are, however, material facts in dispute which make it impossible for this Court to hold, as a matter of law, that the statutes of limitation began to run in 1982.

Plaintiffs may have had knowledge of the possibility of fraud by the time the Redemption Offer was made,[9] and such knowledge may in some cases trigger a duty to investigate. *See, e.g., Bresson v. Thomson McKinnon Securities, Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986). *But see Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421, 1428 (S.D.N.Y. 1984). The parties dispute, and the Court is not now in a position to decide, whether such a duty to investigate existed as a matter of law, and whether such investigation would have sufficiently revealed the identities of the defendants and the nature of the fraud.

The defendants argue that the plaintiffs had a duty to conduct a simple inspection of the partnership records, which they had a statutory right to do. It is argued that such an inspection would have sufficiently revealed the fraud, and commenced the limitations period. Although the partnership records were initially seized by the government as part of the criminal investigation, the moving defendants assert that those records were returned to SGS shortly after they were seized. Affidavit of Paul Vizcarrondo, Jr., Esq., sworn to on April 20, 1987 ("Vizcarrando Affidavit"), ¶ 3. As late as June 1982, however, Senft was representing to the limited partners that he was taking all legal steps at his disposal to get the records returned. Berry Affidavit, Exhibit F at 004175. Plaintiffs need not

establish their diligence in attempting to discover the cause of action if the defendant has engaged in active concealment. *Robertson, supra,* 609 F.2d at 593; *Baskin v. Hawley,* 807 F.2d 1120, 1131 (2d Cir. 1986). It would not be an unreasonable inference here to interpret Senft's actions as active concealment, and his failure to identify SGS's trading partners might well indicate their involvement in such concealment.

Additionally, the agreements between SGS and the moving defendants are alleged to have been oral, and the government, in fact, granted immunity to Vitrella and Allen to elicit testimony about the oral fraudulent scheme at the criminal trial. Even if there were partnership records available to the plaintiffs, it is not clear that this alone would commence the running of the statutes.

The moving defendants rely heavily upon *Allred v. Whatley* [1985–86 Transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 92,259, 1985 WL 5803 (N.D.Ga.1985). That case also involved SGS; the plaintiffs there sued investment advisors that recommended investment in a SGS-related company. The pendency of the criminal investment of SGS was held to have commenced the running of the statutes against the advisor defendants, because the plaintiff then knew that his investment was not as it was represented by those defendants. Unlike here, there were no issues as to the actual identity of the defendants, imputation of knowledge of one defendant's fraud to another, or uncertainty as to the nature of the fraud.

The criminal investigations of SGS indicated the probable existence of some form of tax fraud. Those sealed investigations did not, however, signal the existence of the fraudulent fake trading scheme alleged in the Complaint, nor did they necessarily trigger a duty to investigate and discover that scheme. That duty is easy to postulate in retrospect, and the evidence may ultimately indicate, in fact, that it arose in 1982. A present finding that such a duty

---

**9.** Plaintiffs assert that they did not have such knowledge. *See,* Declarations of William S. Cowling II, *et al.,* sworn to on February 2–12, 1987 (collectively "Plaintiffs' Declarations").

was imposed, however, would depend upon impermissible inferences drawn from disputed facts, and as such would be clearly improper. *Friedman, supra,* 482 F.2d at 439. *See also Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984) (when claim should have been discovered may be determined as a matter of law only when "uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.")

Given the above, the various statutes of limitation periods cannot be said to have commenced, as a matter of law, prior to the criminal indictment becoming public in late 1983. These actions were filed in September, October and November of 1985, or in all cases less than three years from the date that the statutes began to run. This is dispositive of the statutes of limitations issues; none of the various statutes argued to be applicable by the defendants are shorter than three years.[10] Summary judgment for the moving defendants on statutes of limitations is denied on the RICO, common law fraud and negligence claims, as to all plaintiffs.

5. *Jurisdiction Over Pendent State Law Claims.*

Finally, the moving defendants urge, on the assumption that all of the other federal claims would be dismissed, that this Court dismiss the remaining pendent state law claims. As indicated above, the defendants' assumptions with regard to the federal RICO claims are erroneous. Additionally, federal claims remain in this Court against the non-moving defendants. The state and federal claims here all arise from the same common nucleus of facts, *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and this Court will continue to exercise pendent jurisdiction over the state law claims.

In their opposition papers, plaintiffs moved for sanctions. This Court has previously noted that Rule 11 sanction motions can themselves be baseless and frivolous, *Pompano–Windy City Partners v. Bear Stearns & Co.,* 698 F.Supp. 504, 508 (S.D. N.Y.1988), and this is an example of such a baseless application. The sanctions motion warrants no further discussion; it is denied in its entirety.

## CONCLUSION

Summary judgment for defendants LMI, Gill & Duffus, Vitrella and Allen is partially granted; plaintiffs' claims under the federal securities laws are dismissed.

Defendants' motions for summary judgment on the RICO and negligent misrepresentation claims are denied, as are challenges to all claims based on statutes of limitation. Plaintiffs' cross motion for sanctions is denied in its entirety.

SO ORDERED.

---

**10.** There is a single exception, namely the argued limitations period for Section 10(b) claims. The defendants urge that the Court borrow a one year federal provision for these claims, as the Third Circuit has done in *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). In the present case the issue does not arise, given the Court's prior holding that the Complaint does not sufficiently state a Section 10(b) claim. *See,* Part 1.B. above.

If there were Section 10(b) claims, however, the clear law in this Circuit would indicate that the Court would borrow an analogous state limitations statute, specifically the six year period for common law fraud in New York. *Armstrong v. McAlpin,* 699 F.2d 79, 86 (2d Cir.1983). *See also Eickhorst v. American Completion and Development Corp.,* 706 F.Supp. 1087 (S.D.N.Y. 1989); *Heineman v. S & S Machinery Co.,* 707 F.Supp. 86 (E.D.N.Y.1989) ("[D]efendants' contentions that the Second Circuit will, at some time in the future, adopt a federal statute of limitations period for claims under section 10 are unavailing. This Court is bound to follow the clearly established precedent of this circuit.")