Hancock, Jr., J.
(dissenting). In its decision today, the Court adopts a new rule to govern accountants’ liability for negligent misrepresentation. By holding that plaintiff has not made a sufficient factual showing to survive defendant’s motion for summary judgment, the majority reimposes the stringent privity rule of Glanzer v Shepard (233 NY 236) and Ultramares Corp. v Touche (255 NY 170). It departs from what until now has been the less restrictive rule of White v Guarente (43 NY2d 356) and Credit Alliance Corp. v Andersen & *709 Co. (65 NY2d 536, 551), and erects one of the most forbidding legal barriers in the country to accountants’ liability. I, therefore, respectfully dissent.
Two points must be understood: (1) only the last of the three Credit Alliance elements is in issue — i.e., whether there has been "some conduct on the part of the accountants linking them to [plaintiff], which evinces the accountants’ understanding of [the plaintiff’s] reliance” (id., at 551); and, (2) because this is a motion for summary judgment dismissing the complaint, plaintiff need not prove "linking conduct” but only make a sufficient showing to establish a triable issue of fact (see, Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404).
It is significant that none of the accountants conducting the audit was still employed by Main Hurdman when the action was commenced. Because the motion court declined to allow the depositions of these accountants, SPEC has not had the benefit of the testimony of those directly involved in the 1984 audit. Despite this, the serious factual issues raised by plaintiff’s moving papers demonstrate that depriving it of any chance to prove its case directly conflicts with established summary judgment law and with what until today has been the rule under Credit Alliance. This case, by no means, turns only on "the single phone call” (majority opn, at 705) made by "SPBC’s vice-president, Seiden, to Main Hurdman’s audit partner, Freeman” (id), important though that call was. As will be apparent from the summary which follows, the phone call is only part of the "linking conduct” clearly evincing Main Hurdman’s knowledge of SPBC’s reliance.
I
The parties involved in this lawsuit are three: the accounting firm, Main Hurdman, which was allegedly negligent in preparing and certifying its client’s 1984 financial statement; Main Hurdman’s client, Top Brass, whose statements were audited; and the plaintiff, SPEC, a commercial lender which made loans to Top Brass on the security of its accounts receivable and inventory. The credit was allegedly extended in reliance on representations made by the accountants in their audit of the Top Brass statements.
The critical events occurred between August 20, 1984 when Main Hurdman commenced its field work for the 1984 audit and early October 1984 when SPEC, in reliance on Main *710 Hurdman’s representations, completed its final approval process and began to advance funds. Of particular significance as conduct evincing Main Hurdman’s knowledge of SPBC’s intended reliance on its representations is the telephone call on September 14 made by Stephen Seiden of SPEC, at the request of Top Brass, to Douglas Freeman, the Main Hurdman auditing partner. In this phone call, Freeman gave oral assurances to Seiden concerning the reliability of the accounts receivable figure, the adequacy of the reserve for bad accounts, and the accuracy of the 1984 income figures as set forth in the then uncertified tentative audit draft.
The 1984 dealings were not the first credit negotiations between SPEC and Top Brass in which Main Hurdman had had a role. In the fall of 1983, SPEC had made a similar proposal for an extension of a $20 million line of credit to Top Brass to be secured, as in 1984, by accounts receivable and inventory. This proposal was ultimately rejected in December 1983 when Top Brass decided to make no change in its financing arrangements. However, during these negotiations SPBC’s Seiden discussed the figures shown in the Top Brass first quarter 1984 audit prepared by Main Hurdman with one of the Main Hurdman auditors. Main Hurdman was advised that SPEC had a specific concern with the accounts receivable and that it would be relying on Main Hurdman’s opinion as to the adequacy of the accounts receivable reserve.[1] When Top Brass ultimately decided not to accept SPBC’s proposal, it stated that it wanted to maintain its contact with SPEC for possible borrowing in the near future and sent SPEC a copy of the Main Hurdman 1984 first quarter final audit.
Negotiations between SPEC and Top Brass resumed again in July of 1984 when Top Brass, having substantially increased its business, needed a $50 million line of credit. At the end of July, Seiden made Top Brass a proposal for the $50 million credit, conditioned on SPBC’s satisfaction with Top *711 Brass’ capital, earnings, and accounts receivable. Top Brass was advised that no final approval would be given until SPEC received Main Hurdman’s opinion as to its 1984 financial statements and the adequacy of the uncollectible accounts reserve.
When Main Hurdman commenced its auditing of Top Brass’ 1984 statements on August 20, 1984, it knew of Top Brass’ new negotiations with SPEC for the $50 million line of credit. Among the "initial procedures” itemized in the August 20, 1984 Audit Planning Checklist is "[d]iscussion with client officials to establish an understanding of the engagement, and to obtain information about business developments that might affect the engagement”.[2] Main Hurdman’s "1984 Audit Program” — drafted early in the audit process — provided that Main Hurdman "[r]eview authorizations in corporate minutes or other appropriate authoritative documentation for additions to debt”. Main Hurdman had received the minutes of the Top Brass directors’ meetings which noted the directors’ authorization to negotiate a line of credit with SPEC. A Main Hurdman memorandum concerning the minutes specifically refers to the directors’ authorization for negotiations with SPEC as "an item of note”.[3] The "pencil draft” of the 1984 balance sheet, sent to Main Hurdman by Top Brass and prepared by the Top Brass controller (who had been a Main Hurdman auditor during Top Brass first quarter audit), bore a notation reflecting Top Brass’ negotiations for "at least $40 million to replace the existing $20 million line of credit * * * [to] be secured by accounts receivable” (emphasis added).[4] In its planning memorandum in preparation for the auditing *712 process, Main Hurdman took particular note of the concern expressed in 1983 over the doubtful accounts reserve. The memorandum stated that based upon their experience in 1983,[5] accounts receivable were “to be thoroughly reviewed, with careful attention to be given to delinquent accounts, collectability and the provision for doubtful accounts” (emphasis added).
Main Hurdman completed its field work on September 12. The next day, Top Brass sent SPEC a copy of its 1984 financial statement and a draft of Main Hurdman’s audit opinions stamped "tentative draft subject to adjustment.” Main Hurdman’s draft recited that Top Brass was negotiating a line of credit for at least $40 million to be secured by accounts receivable. When he received the Main Hurdman draft, Seiden told Top Brass that SPEC would not make a final decision on the credit extension until it received Main Hurdman’s final report and opinion. Top Brass advised Seiden that the Main Hurdman final report would be the same as the tentative draft and that its audit opinion would be unqualified.
To verify these statements and to assure SPEC of the tentative draft’s reliability, Top Brass requested that Seiden telephone Freeman at Main Hurdman. By this time, as has been shown, Main Hurdman and Freeman, in particular, were well aware of the SPEC $50 million line of credit proposal. Indeed, Freeman had drafted the Main Hurdman "subsequent events memo” which noted that "the client currently is negotiating for revolving line of credit of at least $40 million — this is to replace the current line of credit of $20 million — this is being negotiated with UMB and/or Security Pacific and is to be secured by accounts receivable” (emphasis added).[6] Top Brass told Seiden that Freeman knew of SPBC’s intended *713 reliance on the audit, that Freeman was expecting SPEC to call and that he would answer any question SPEC had.
On September 14, 1984 Seiden telephoned Freeman. Seiden asked about the financial statement and specifically about the doubtful accounts reserve fund.[7] Seiden told Freeman in "no uncertain terms that [the audit report] was a very important document” and "that the numbers that were presented thereon, especially the profitability of the company and the collectability of the receivables were the basis on which we were approving the deal” (see, record on appeal [emphasis added]). In response to Seiden’s question as to whether "there was anything in his examination that would lead anyone to believe that the company didn’t make $8-V£ million in 1984, or thereabouts” Freeman said that "that income figure was a number that they were certifying to and had done their due diligence and were satisfied with issuing a statement based on it, that there would be no qualifications in the opinion letter” (emphasis added).
In early September of 1984, Bankers Trust had been invited to participate in extending the line of credit to Top Brass. Based on Freeman’s assurances to Seiden that the Main Hurdman tentative audit report was accurate and would shortly be certified without material changes, Seiden prepared and signed the Credit Committee Recommendation for the $50 million line of credit and the extension of credit was conditionally approved both by SPEC and Bankers Trust. After receipt of Main Hurdman’s final written opinion in October 1984, both Bankers Trust and SPEC completed their approval processes and commenced dispersing the loans.
*714 II.
A. Credit Alliance is Satisfied Here.
The criteria for accountant liability to a noncontractual third party are well established. Such liability, as the majority repeatedly reminds us, is closely circumscribed; but, in our decisions since White v Guarente (supra), we have emphasized that "the court has [not] erected a citadel of privity for negligent misrepresentation suits” (Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 424). Instead, the Court has adopted a description of the circumstances which exist when liability may be established, i.e., "a relationship [between the parties] so close as to approach that of privity” (id., at 424). Until Credit Alliance, the tests of when the relationship sufficiently approaches privity were articulated in "various ways” (id., at 425). But, as we stated in Ossining:
"Most recently, in Credit Alliance, we spelled out the following criteria for liability: (1) awareness that the reports were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant’s understanding of their reliance (Credit Alliance Corp. v Andersen & Co., 65 NY2d, at 551)” (id., at 425 [emphasis added]).
The standardized definition of privity articulated by the three Credit Alliance requirements thus replaced the various tests previously applied and imparted uniformity to the area of accountant liability.
There is no dispute that the first two criteria of Credit Alliance are satisfied. There is ample proof that well before the September 14 conversation between Seiden and Freeman, Main Hurdman knew that the audit was to be used for the credit negotiations and that SPEC would rely on its audit report and opinion. The minutes of the 1983 and 1984 Top Brass director’s meetings authorizing credit negotiations, the audit planning memo, the pencil draft, and the tentative draft of the audit report all indicate that Main Hurdman had this knowledge from the outset of the audit. The only issue is whether, for purposes of avoiding summary judgment, the record contains enough evidence of "linking conduct” to satisfy the third criterion of Credit Alliance. As will be shown, there is ample evidence to create a factual issue on this third *715 criterion and, hence, the Credit Alliance test for a relationship sufficiently approaching privity is satisfied, at least for the purposes of avoiding summary judgment.
The "linking conduct” prerequisite as framed in Credit Alliance is that there be some showing of conduct or contacts between the accountants and the relying third party "which evinces the accountants’ understanding of that party['s] * * * reliance” (65 NY2d, at 551, supra [emphasis added]). Since Credit Alliance, no New York decision, including today’s opinion, has attempted to explain what is meant by conduct evincing an accountant’s understanding of a third party’s reliance.[8] The language of the Credit Alliance opinion suggests that what is called for is an evidentiary showing of some communication or contacts demonstrating the accountant’s awareness of the third party’s reliance. Indeed, this is how other courts have read Credit Alliance. As one court put it, the requirement is "that the accountants manifest conduct underscoring their understanding of a particular rionclient’s reliance upon the work product” (First Natl. Bank of Commerce v Monco Agency, 911 F2d 1053, 1059 [5th Cir]). Another court has said that touchstone of the inquiry "is not * * * formal direct communication, but rather some link of the 'defendant to plaintiff which evinces defendant’s understanding of plaintiff’s reliance’ ” (Huang v Sentinel Govt. Sec., 709 F Supp 1290, 1298). If, as the language of Credit Alliance indicates, what is required is a demonstration of some conduct evincing or underscoring the accountant’s knowledge of the reliance, then it seems self-evident that there is enough here to withstand summary judgment.
Of the several incidents of "linking conduct”, the telephone conversation on September 14, 1984 between Seiden and Freeman is unquestionably the most telling. Seiden’s phone call, one that Freeman expected, was placed at the request of Top Brass. What conduct on the part of accountants could more surely link them to their client’s prospective lender and "evince” their understanding of the lender’s reliance than a conversation in which the lender informs the accountants of its intended reliance on the client’s financial condition as stated in the financial statements then under audit and asks for and receives the accountants’ assurances of the statements’ accuracy?
*716 Despite the Court’s efforts to make it seem so, this phone call was not just some last minute stratagem to procure "deep pocket surety coverage” (majority opn, at 707) for the small "cost of a phone call” (id.). Seiden’s call to Freeman was at Top Brass’ request. A telephone call between a prospective lender and a prospective borrower’s accountants — requested by the borrower for the express purpose of having the accountants assure the lender of the soundness of the client’s financial position so as to induce the loan — can hardly be passed off as a cheap stratagem of the lender.
But, the September 14 conversation is only a part of the evidence. Other actions by Main Hurdman point unequivocally to its understanding of SPBC’s intended reliance on the audit: e.g., Main Hurdman’s preparation and circulation of the audit planning memo referring to the previous year’s experience and the need for careful attention to delinquent accounts; its receipt and acknowledgment of the Top Brass directors’ minutes authorizing the credit negotiations with SPEC; its receipt and consideration of the "pencil draft” noting the credit negotiations in planning the 1984 audit; and its reference in the subsequent events memo to the SPEC credit negotiations as an item to be considered. Despite the majority’s persistent disavowals (see, majority opn, at 704, 705), all of this is conduct evincing Main Hurdman’s understanding— from the very earliest stages of the audit process — of SPBC’s intended reliance on the audit and of its specific concern with the adequacy of the doubtful accounts reserve.
More conduct should certainly not be needed to evince Main Hurdman’s knowledge of SPBC’s reliance, but there is more— the contacts in late 1983 between Main Hurdman and SPEC concerning SPBC’s unsuccessful credit proposal to Top Brass. Main Hurdman knew that its audit of the first quarter 1984 accounts receivable and bad accounts reserve was central to SPBC’s proposal. In his December 1983 conversation with the Main Hurdman auditor-in-charge, Seiden had emphasized his concern with the accounts receivable reserve and had specifically advised Main Hurdman that SPEC would rely on Main Hurdman’s audit of Top Brass in making its credit proposal (see, supra, at 710, n 1). It is not likely that Main Hurdman would have forgotten SPBC’s concern with its client’s receivables and SPBC’s stated intention to rely on their audit when, only a few months later, their client again sought a line of credit from the identical lender, SPEC.
*717 In sum, the issue in this case could not be more clearly focused because there is no dispute that SPEC has met the first two parts of the Credit Alliance test. The critical elements of SPEC’s reliance on the audit in making its credit decision and Main Hurdman’s awareness of that reliance are conceded. If what Credit Alliance requires for the third element is a showing of some additional evidence of conduct evincing or underscoring the conceded fact of Main Hurdman’s knowledge of SPEC’s reliance, then it seems almost inconceivable that this record could be insufficient to create a triable issue on that third element. But, the Court holds that it is not enough. In granting summary judgment, it has evidently concluded that what Credit Alliance demands is not conduct evincing defendant’s knowledge of the plaintiff’s reliance but instead a showing of an "unmistakable relationship” equivalent to that in European Am. Bank & Trust Co. v Strauhs & Kaye (65 NY2d 536, 554), and one of such closeness or intimacy as to satisfy the privity requirements of Glanzer and Ultramares.
B. The Court’s New Rule for Accountants’ Liability.
The Court grants summary judgment to the defendant for essentially two reasons: that use of the audit by SPEC was not the exclusive end and aim of the audit (majority opn, at 704,707); and that Main Hurdman’s conduct does not "creat[e] an 'unmistakable relationship’ with SPEC” (majority opn, at 707). SPEC’s evidence of linking conduct, detailed above (supra, II [A]), is simply rejected as being insufficient to satisfy the majority’s "unmistakable relationship” requirement.
The Court provides no definition of "linking conduct” other than that set forth in Credit Alliance (65 NY2d, at 551) and offers no explanation of what it requires as conduct evincing defendant’s understanding of plaintiff’s reliance. It does, however, furnish some instructive clues as to the sort of conduct that would meet its test by pointing out what plaintiff has not shown here. For example, the Court stresses that plaintiff has submitted no proof that: Main Hurdman "shaped its 1984 audit opinion to meet any needs of SPEC” (majority opn, at 706); or that Top Brass retained Main Hurdman "to prepare the audit report for the purpose of inducing SPEC to extend credit to Top Brass”; or that Main Hurdman "ever specifically agreed with Top Brass to prepare the report for SPEC’s use or according to SPEC’s requirements” (majority opn, at 706). The Court’s emphasis on SPEC’s failure to establish that Top *718 Brass specifically engaged Main Hurdman to prepare the audit for SPEC, its repeated citations to European American Bank (majority opn, at 703, 704, 705, 707) and to the "unmistakable relationship” existing in that case (see, 65 NY2d, at 554), and its references to the exclusive "end and aim” language in Glanzer all send the same clear signal — i.e., that henceforth, the standard for liability will be a relationship or specific undertaking at least equal to that in European American Bank and sufficiently intimate to pass the privity test of Ultramares and Glanzer.
The majority holding sharply curtails the Credit Alliance holding. By imposing its "exclusive, end and aim” requirement (majority opn, at 704, 707), the Court reerects a barrier that has not appeared in our law since it was removed in 1977 in White v Guarente (supra). Prior to 1977, the law of negligent misrepresentation by accountants was guided by this Court’s 1922 decision in Glanzer and its 1931 decision in Ultramares which required an exacting privity relationship between plaintiff and defendant. For all intents and purposes, plaintiffs relationship must have been that of a third-party beneficiary to the contract for the accountants’ services. Indeed, under the Glanzer and Ultramares rationale, accountants’ third-party liability was considered to be an extension of the rule of Lawrence v Fox (20 NY 268) and Seaver v Ransom (224 NY 233) for third-party beneficiary contractual responsibility (Glanzer v Shepard, 233 NY, at 241, supra; Ultramares Corp. v Touche, supra, at 182). The Ultramares Court noted that in Glanzer, the service provided "was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee” (Ultramares Corp. v Touche, supra, at 183).
In our 1977 White decision, we loosened the privity requirement of Ultramares without rejecting it outright (White v Guarente, 43 NY2d, at 362). In White, accountants hired by the general partners to audit a limited partnership were found liable to the limited partners even though there was no contract or contact with the limited partners or any specific undertaking of a duty to them. We stated in White:
"Here, accountant Andersen was retained to perform an audit and prepare the tax returns of Associates, known to be a limited partnership, and the accountant must have been aware that a *719 limited partner would necessarily rely on or make use of the audit and tax returns of the partnership, or at least constituents of them, in order to properly prepare his or her own tax returns. This was within the contemplation of the parties to the accounting retainer. In such circumstances, assumption of the task of auditing and preparing the returns was the assumption of a duty to audit and prepare carefully for the benefit of those in the fixed, definable and contemplated group whose conduct was to be governed, since, given the contract and the relation, the duty is imposed by law and it is not necessary to state the duty in terms of contract or privity” (White v Guarente, 43 NY2d, at 361-362 [emphasis added]).
Unlike the exaction of Ultramares and Glanzer that the relationship be so close that plaintiff is "in effect, if not in name” a party to the contract whose reliance is "the end and aim” of the transaction, the White requirement is that plaintiff’s reliance need be only "one of the ends and aims of the transaction” (White v Guarente, 43 NY2d, at 362 [emphasis added]) and one which "was, or at least should have been, specifically foreseen” (id., at 362). Until today, Credit Alliance could be read as being consistent with White in not making accountants’ liability contingent on their preparation of the audit for the specific benefit of the third party. No matter how it is viewed, today’s decision effectively overrules White and significantly limits Credit Alliance.
III.
New York’s existing privity rule under Credit Alliance is already the country’s most exacting, followed by only a few jurisdictions (see, e.g., Colonial Bank v Ridley & Schweigert, 551 So 2d 390 [Ala]; Idaho Bank & Trust Co. v First Bancorp, 115 Idaho 1082, 772 P2d 720; Thayer v Hicks, 243 Mont 138, 793 P2d 784; Citizens Natl. Bank v Kennedy & Coe, 232 Neb 477, 441 NW2d 180). The Court’s holding today requiring a heightened privity now makes New York the most restrictive of the jurisdictions purporting to apply Credit Alliance (see, e.g., Thayer v Hicks, supra; Duke v Touche Ross & Co., 765 F Supp 69, 77 [SD NY]; Guildhall Ins. Co. v Silberman, 688 F Supp 910, 914 [SD NY]; see also, Toro Co. v Krouse, Kern & Co., 827 F2d 155 [7th Cir]; Equitable Life Assur. Socy. v Grant *720 & Co., 627 F Supp 1023). Most jurisdictions now adopt the more lenient Restatement approach allowing recovery whenever a particular party’s reliance is foreseen (Restatement [Second] of Torts § 552) or some less restrictive variant (see, Thayer v Hicks, 793 P2d, at 788-789, supra; and First Natl. Bank of Commerce v Moneo Agency, supra, at 1057-1060 [collecting cases]; see also, Credit Alliance Corp. v Andersen & Co., supra, at 553, n 11; Achampong, Common Law Liability of Accountants for Negligence to Non-Contractual Parties: Recent Developments, 91 Dick L Rev 677; Siliciano, Negligent Accounting and the Limits of Instrumental Tort Reform, 86 Mich L Rev 1929). Indeed, many maintain that New York should follow the national trend and relax its present privity requirement (see, e.g., Besser, Privity? — An Obsolete Approach to the Liability of Accountants to Third Parties, 7 Seton Hall L Rev 507; Note, Accountants’ Liability for Negligence — A Contemporary Approach for a Modern Profession, 48 Fordham L Rev 401).
Finally, there must be no confusion about the posture of this dissent. The dissent does not urge that New York should abandon or in any respect "extend Credit Alliance” (majority opn, at 705). Nor does it suggest that New York should move closer to the national trend in making some adjustment of its present privity requirement. The dissent argues only this: that the factual questions in the record, applying the existing Credit Alliance rule, require an affirmance of the Appellate Division’s denial of summary judgment. What the majority characterizes as merely a showing of SPBC’s effort to turn a phone call into "deep pocket surety coverage” (majority opn, at 706) is a volume of evidence in which the critical elements pertaining to Main Hurdman’s knowledge of SPBC’s reliance on the audit — the first two Credit Alliance criteria — are concededly established. The single question is whether the record is sufficient to create a triable issue on the remaining element —i.e., some conduct linking Main Hurdman to SPEC and evincing Main Hurdman’s conceded knowledge of SPBC’s reliance. The majority’s holding that the record is insufficient on this point results in a pronounced tightening of Credit Alliance, abandons White, and recreates the former privity barrier of Glanzer and Ultramares. I know of no policy or other reason supporting this significant change in our law and the majority gives none.
*721 I would affirm the order denying summary judgment.
Chief Judge Wachtler and Judges Simons, Kaye and Ti-tone concur with Judge Bellacosa; Judge Hancock, Jr., dissents and votes to affirm in a separate opinion.
Order reversed, etc.

. In his deposition testimony concerning his conversation with one of the Main Hurdman auditors, whom he believed to be Richard Mirman, Seiden stated, in part: that he "spoke primarily in 1983 strictly about the receivables * * * and their effect on the P&L” and asked "if they thought you had adequate reserves” or "if they had any problems * * * that we as a lender should know about”; that he had told the auditor that he "was seeking their good auspices to help us out, and that we would be relying on them”; and that in response to his questions, the auditor stated that "they felt the reserves were adequate at this time” and that "there was nothing unusual that we should know about.”

. SPEC’S evidence supports the conclusion that this conversation took place prior to August 20, 1984 and that it was "highly unlikely” (see, record on appeal) that they would not have discussed SPEC’s July 30, 1984 formal credit proposal. SPEC’s submissions are sufficient, in any event, to raise questions of fact as to the contents of that conversation and the date when Main Hurdman was first aware of the SPEC credit negotiations which could be answered upon deposition of the auditors.

. Although the memorandum appears to be dated September 14, 1984, it also bears the date June 30, 1984. SPEC’s submissions in opposition to summary judgment support the conclusion that Main Hurdman had received the minutes prior to the September date. In any event, the date of the receipt of the minutes by Main Hurdman is a factual question which could undoubtably be answered if the Main Hurdman auditors were deposed.

. There is evidence that Mirman changed the original typewritten wording of this notation by crossing out the words "up to” and writing in "at least”, reflecting the $50 million proposal made by SPEC. Again, the *712 significance of the revision presents a question of fact which could be answered if Mirman were deposed.

. Although the reference to the prior experiences in 1983 concerning receivables does not mention SPEC by name, it is inferable that it refers to SPBC’s previous difficulties with the delinquent accounts reserve, the topic of Seiden’s discussion with Main Hurdman in late 1983. The planning memo refers to accounts receivable based on the prior year’s experience and review of the pencil draft, which refers to the then current negotiations for "at least $40 million * * * secured by accounts receivable”. A question of fact, at least, is thus raised as to the significance of the reference to the prior experience in 1983.

. Although the subsequent events memo was dated September 14, 1984, there is evidence that it was completed before then.

. In his deposition testimony Seiden stated that Freeman told him that he knew that Top Brass was negotiating with SPEC "because the notes to the statement made some mention of the negotiation for a new line of credit” and that he "knew it was Security Pacific. He had been brought up to the fact by the company”.
With specific reference to the receivables, Seiden pointed out to Freeman, "that the bad debt reserve as a percentage of the total receivables had— hadn’t gone up much in year-ending '83” and he asked, "if there was anything that was underlying that would lead him to believe that the 8 percent was not an adequate number”. According to Seiden, Freeman’s reply "was one of those general kind of responses that they’ve done the job, and they’ve done their work, and they were comfortable with the fact that they were issuing an opinion, an unqualified opinion as far as the statement was concerned” (see, record on appeal).

. Although the majority suggests (majority opn, at 706,708) that the New York case law sufficiently articulates the requirements of "linking conduct” under Credit Alliance, it cites no New York decisions enunciating a legal standard of linking conduct.