**Dr. William WELCH III, et al.**

v.

**CADRE CAPITAL, et al.**

**Civ. No. H–88–717(AHN).**

United States District Court,
D. Connecticut.

Aug. 18, 1989.

Opinion on Motion to Dismiss § 10(b) and
Rule 10b–5 Actions April 12, 1990.

468

Peter Luria, West Hartford, Conn., for plaintiffs.

Jeffrey A. Blueweiss, Bai, Pollock & Dunnigan, Bridgeport, Conn., for defendant Cadre Capital.

R. Laken Mitchell, Nashville, Tenn., for defendant R. Laken Mitchell, Esq.

Antoinette Leone Ruzzier, Ward, Sevarino & Ruzzier, Hartford, Conn., for defendants John Roberts, Ednalou Ballard, Norman Ballard and Financial Center Securities.

Russell J. Ober, Rose, Schmidt, Hasley & DiSalle, Pittsburgh, Pa., for defendant Northwest Mut. Sav. Ass'n.

Linda Karter, Schatz & Schatz, Ribicoff & Kotkin, Hartford, Conn., for defendant Mutual Fire & Marine Inland Ins. Co.

### PARTIAL RULING ON PENDING MOTIONS TO DISMISS

NEVAS, District Judge.

The three plaintiffs in this case alleging investment fraud purchased interests in May 1984 in a limited partnership known as the "Keystone 84–1 Oil and Gas Drilling Partnership" ("Keystone"). In their six-count complaint, the plaintiffs allege violations of several federal securities statutes, a Connecticut securities statute, and common law. They have sued eight defendants purportedly either directly or peripherally associated with Keystone. Pending are motions to dismiss filed by six defendants; the motions raise a host of challenges to the complaint and are brought under Rules 9(b) and 12(b)(6), Fed.R.Civ.P. For the following reasons, the defendants' motions are granted in part. The court dismisses the plaintiffs' causes of action brought under the Securities Act of 1933 ("1933 Act"), 15 U.S.C. Section 77a *et seq.* As noted *infra, see* section II.A.2., the court requests further briefing on an issue relating to the plaintiffs' cause of action brought pursuant to the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. Section 78a *et seq.* Until that issue is resolved, the court reserves decision on the remaining challenges to the complaint.

### I. *Background*

#### A. *Factual*

The well-pleaded allegations of the complaint support the following story line: After being contacted by plaintiff Dr. William Welch in the spring of 1984, defendant John Roberts, a broker with defendant Financial Center Securities ("FCS") of Farmington, Connecticut, recommended Keystone to Welch as an investment opportuni-

ty.[1]  Keystone involved the drilling of six oil and gas wells.  Limited partners in Keystone could subscribe in units of $20,000 each—$5,000 down in cash and $15,000 from an interest-bearing promissory note.  Total capital contributions from limited partners were to range from $880,000 to $1,760,000.  On May 25, 1984 Welch met with Roberts and purchased two units in Keystone, executing two promissory notes totalling $30,000.  By July of the same year, Welch had paid the necessary $10,000 cash.

Under the terms of the Keystone program, its general partners could assign the investors' promissory notes to lending institutions as security for loans made to Keystone to finance drilling operations.  Defendant Cadre Capital was the managing general partner for Keystone.  On July 24, 1984 defendant R. Laken Mitchell, the attorney for the general partnership, notified Welch by letter that his two notes had been assigned to Northwest Mutual Savings Association, now defendant Northwest Savings Bank ("Northwest"), as security for a Keystone loan.  At about that time defendant Mutual Fire and Marine Inland Insurance Company ("Mutual Fire") issued a surety bond on behalf of Keystone's general partners guaranteeing Northwest payment of the plaintiff's notes.

Also in May 1984, defendants Ednalou and Norman Ballard, principals in FCS, solicited plaintiffs Dr. Andrew Guest and his wife, Elizabeth, for a series of financial seminars.  After attending these seminars, the Guests were induced to purchase six limited partnerships in Keystone.  On May 10, 1984 they paid $30,000 cash for these units and executed a promissory note for $90,000.  On the same day that he wrote to Welch, Attorney Mitchell notified the Guests that their note had also been assigned to Northwest.  As it had for the Welch transaction, Mutual Fire provided a surety bond pledging payment of the Guests' note.

In May 1985 Welch contacted Roberts about inadequate status reports on the drilling operations.  FCS represented that it had retained an outside advisor to evaluate Keystone: the advisor produced a report, dated October 15, 1985 and forwarded to the plaintiffs on November 4, 1985, which concluded that Keystone was being properly operated.  Also in May 1985 Welch inquired of Roberts and FCS about the possibility of refinancing his promissory notes at a lower interest rate.  A Keystone general partner, Commonwealth Enterprises, Inc. ("Commonwealth"), told Welch that his subscription funds had been placed in interest-bearing escrow accounts and that refinancing would not then be economically sound.

FCS wrote the plaintiffs on May 14, 1986 to inform them of a second outside evaluation of Keystone.  FCS told the plaintiffs that it would update them as soon as FCS received a report.  On June 3, 1986 the Guests received a letter from a Keystone general partner reassuring them of the soundness of the program.  In January 1987 Roberts informed Welch that Keystone was suffering financial difficulties.  Two months later the Guests received word from FCS that Keystone was insolvent and Commonwealth bankrupt.

### B.  *Causes of Action*

The plaintiffs brought suit on October 17, 1988.  Count one of the complaint alleges violations of sections 5(a) and (c) of the 1933 Act, 15 U.S.C. Section 77e(a) & (c).  According to the complaint, the defendants never registered the security interests in Keystone with the Securities and Exchange Commission ("SEC").

Count two invokes the anti-fraud provisions of the 1933 Act—sections 12 and 17, codified at 15 U.S.C. Sections 77*l* and 77q(a), respectively—and section 10(b) of the 1934 Act, 15 U.S.C. Section 78j(b), and Rule 10b–5 promulgated thereunder, 17

---

**1.**  In deciding Rule 12(b)(6) aspects of this case, the court accepts as true all well-pleaded factual allegations set forth in the complaint, *see Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977), and construes these allegations in a light most favorable to the non-moving parties.  *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

C.F.R. Section 204.10b–5. From May 1985, according to the plaintiffs, the defendants have defrauded them about Keystone. The fraudulent scheme has allegedly included dissemination of false and misleading information, both oral and written, about the suitability of limited partnership interests in Keystone. The documents provided the plaintiffs failed to disclose, among other things, prior litigation by the SEC against John Meatte, the president of Commonwealth, fiduciary conflicts of interest among the general partners in Keystone, and the diversion of Keystone monies for the private use of Meatte and Commonwealth. According to the complaint, at the times of their initial contacts with the plaintiffs, Roberts, the Ballards, and FCS knew of Meatte's litigation history and chose not to reveal it. Defendant Mitchell, the attorney, prepared a "Private Placement Memorandum" for Keystone; the document omitted mention of Meatte's litigation history and the plaintiffs relied on the memorandum to their detriments. At some unspecific time before the sales of the Keystone units to the plaintiffs, Northwest and Mutual Fire purportedly performed their own investigations into Keystone, discovered or should have discovered Meatte's troubled past, and withheld this information from the plaintiffs.

As to the remaining four counts the plaintiffs invoke the count's pendent jurisdiction over their state law claims. In count three the plaintiffs allege violations of the anti-fraud provision of the Connecticut Uniform Securities Act ("CUSA"), Conn.Gen.Stat. Section 36–498. The alleged misrepresentations and omissions underlying count two also support the CUSA cause of action, according to the plaintiffs. Counts four, five, and six hinge on common law fraud, breach of fiduciary duty, and negligent misrepresentation, respectively.

## II. *Discussion*

Motions to dismiss have been filed by all defendants except Mitchell and Mutual Fire. The motions raise sundry challenges, some specific to an individual defendant, others common to all defendants. In this partial ruling on the motions to dismiss, the court addresses the following challenges to the complaint.

### A. *Federal Causes of Action*

#### 1. 1933 Act

The complaint alleges violations of three sections of the 1933 Act: section 5 (count one); section 12 (count two); and section 17(a)(count two). Section 5 prohibits a person or entity from selling or delivering unregistered securities in interstate commerce. *See* 15 U.S.C. Section 77e. Section 12(1) of the 1933 Act creates a private cause of action for section 5 violations. Under section 12(1), aggrieved holders of unregistered securities may rescind the transactions and recover the consideration paid for the securities or, if the securities have been sold to third parties, may recover damages. *See id.* Section 77*l* (1). Section 12(2) permits a cause of action for the fraudulent sale of securities in interstate commerce. *See id.* Section 77*l* (2). Section 17(a) also prohibits the fraudulent offer or sale of securities in interstate commerce. *See id.* Section 77q(a).

Causes of action brought pursuant to sections 12(1) and (2) are governed by the statute of limitations set forth in section 13 of the 1933 Act, which states in relevant part:

> No action shall be maintained to enforce any liability created under section ... [12(2)] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section [12(1)] of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section ... [12(1)] of this title more than three years after the security was bona fide offered to the public, or under section [12(2)] of this title more than three years after the sale.

*Id.* Section 77m. By the defendants' reckoning, the Keystone securities underlying this suit were bona fide offered and/or sold

to the "public" no later than May 25, 1984, the last investment date alleged by the plaintiffs. Thus, according to the defendants, the three-year outside limits on causes of action grounded on sections 12(1) and (2) expired in May 1987, some 17 months before the plaintiffs brought suit.

■ The plaintiffs do not dispute the May 1984 trigger date. Instead, they argue that the three-year limits should be equitably tolled because the defendants actively concealed their fraudulent conduct. The plaintiffs read a discovery exception into the three-year provisions of section 13. They rely for the most part on *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F.Supp. 493, 507–08 (S.D.N.Y.1987) (*"Gas Reclamation"*), where the court concluded that section 13 does not begin to run on either a section 12(1) or 12(2) claim until the fraudulent concealment is discovered. *But see McLernon v. Source Int'l, Inc.*, 701 F.Supp. 1422, 1427 (E.D.Wis.1988) (by providing in section 13 a discovery exception for section 12(2) violations and omitting such an exception for section 12(1) violations, "[t]he logical conclusion is that Congress intended to prohibit application of a discovery rule to section 12(1) claims.")

Though the *Gas Reclamation* court undeniably read a discovery exception into section 13 as to section 12(1) claims, the case lacks the persuasive force intended by the plaintiffs. The engrafted discovery exception pertained only to section 12(1) claims brought within one year after the violation occurred. 659 F.Supp. at 507–08. *See also Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir.1969). The *Gas Reclamation* court did not create a discovery exception to the three-year maximum prescribed in section 13. The plaintiffs have failed to identify any case that has allowed equitable tolling of the three-year limits allowed for 12(1) and 12(2) causes of action. The court has located only one such case. *See In re Home–Stake*

*Prod. Co. Sec. Litig.*, 76 F.R.D. 337, 344–45 (N.D.Okla.1975).

In *Clute v. Davenport Co.*, 584 F.Supp. 1562, 1576–77 (D.Conn.1984) (Blumenfeld, J.), the court followed the "majority" rule and found that the three-year limit in section 13 is an absolute bar to claims based on sections 12(1) and 12(2). "If the three-year limit could be tolled, section 13 'would create a limitation period for all suits of one year from the time discovery of the untrue statements or omissions should have been made, and the three-year provision would serve no purpose at all.'" *Id.* at 1577 (quoting *Turner v. First Wis. Mortgage Trust*, 454 F.Supp. 899, 911 (E.D. Wis.1978)). The court aligns itself with *Clute*. The express language of section 13 demonstrates Congress' intent to place a three-year limit on the bringing of section 12 claims. *See Zola v. Gordon*, 685 F.Supp. 354, 360 & 361 n. 7 (S.D.N.Y.1988) (three-year period in section 13 "an absolute outer limitation;" congressional intent clear that tolling of three-year limit not permitted). The court grants the defendants' Rule 12(b)(6) motions to dismiss the plaintiffs' causes of action premised on sections 12(1) and 12(2).

■ As to the plaintiffs' section 17(a) cause of action,[2] the court grants the defendants' motion to dismiss without reaching the defendants' statute of limitations arguments. In *Rocco v. PaineWebber, Inc.*, Civ. No. N–88–509(AHN), slip op. at 3–5 (D.Conn. May 12, 1989), this court recently concluded that a private cause of action does not lie under section 17(a). No private right of action is expressly provided in section 17(a), but eleven years ago the second circuit held in *Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied sub nom. Goldberg v. Kirshner*, 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979), that an implied private right of action does exist under this statute. *Kirshner* has been criticized both within

---

**2.** The plaintiffs do not specify which subsection of section 17 their claim is based upon, but the court agrees with the defendants that subsection (a) is the most likely provision. As defendant Northwest notes in its supplemental memorandum in support of its motion, the plaintiffs have

failed to address the defendants' challenges to section 17(a) and appear to have abandoned this cause of action. To remove any doubt the court dismisses the claim on the substantive grounds set forth in the text.

and without this circuit. Moreover, the fifth, eighth, ninth, and eleventh circuits have declined to recognize an implied right. *See Landry v. All Am. Assurance Co.*, 688 F.2d 381, 384–89 (5th Cir.1982); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 159 (8th Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1356 (9th Cir.1987) ("*WPPSS Sec. Litig.*"); *Currie v. Cayman Resources Corp.*, 835 F.2d 780, 784–85 (11th Cir.1988). Within this district there is a split of opinion on whether a private right of action exists under section 17(a). *Compare Weisman v. Oliver Rose Sec., Inc.*, Civ. No. B–85–126(EBB), slip op. at 18 (D.Conn. Nov. 10, 1987) (Burns, J.) (*Kirshner*'s binding force has been weakened; no private right of action) *with Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F.Supp. 1362, 1374 (D.Conn.1987) (Blumenfeld, J.) (*Kirshner* remains controlling precedent; private right of action exists).

The *en banc* panel in *WPPSS Sec. Litig.* performed a comprehensive and convincing review of section 17(a) private remedy jurisprudence before concluding that a private cause of action is not available under the statute. The court examined section 17(a) in the light cast by *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court's leading case on private rights of action. 823 F.2d at 1353–56. According to the *WPPSS Sec. Litig.* court,

> The three factors which the Supreme Court has emphasized in applying the *Cort v. Ash* test—the statute's language, its legislative history, and its statutory scheme—all point in precisely the same direction: Congress did not intend in 1933 to create a private right of action under section 17(a). 'We are reluctant to tamper with an enforcement scheme crafted with such evident care.... "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."' [*Massachusetts Mut. Life Ins. Co. v.] Russell*, 473 U.S. [134, 147,

105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)] [quoting *Northwest Airlines, Inc. v. Transport Workers*, 451 U.S. [77, 97, 101 S.Ct. 1571, 1583–84, 67 L.Ed.2d 750 (1981)]. The [1933 Act] contained such an integrated scheme; unless the plaintiffs can establish that Congress later preserved a judicially-created private remedy under section 17(a), any decision to create such a right of action must be left to future congressional action.

*WPPSS Sec. Litig.*, 823 F.2d at 1356.

In *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 n. 3 (2d Cir. 1985), the second circuit indicated its willingness to reexamine *Kirshner*, a pre-*Cort* case. The second circuit's recent decision in *Asch v. Philips, Appel & Walden, Inc.*, 867 F.2d 776 (2d Cir.1989) (*per curiam*), provides strong evidence as to how the court of appeals would likely resolve the section 17(a) private right issue. After performing the three-part *Cort* analysis, the *Asch* court held that a private right of action does not lie under section 15(c)(1) of the 1934 Act, 15 U.S.C. Section 78o(c)(1), one of the anti-fraud provisions of that Act. 867 F.2d at 777. *Asch* buttresses the court's conclusion that no implied private right of action exists under section 17(a). The defendants' motion to dismiss is granted as to the section 17(a) claim.

### 2. 1934 Act

The complaint also alleges violations of section 10(b) of the 1934 Act, which does not contain a statute of limitations for section 10(b). When a federal statute lacks a limitations period, federal courts usually look to the law of the forum state. *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 703–04, 86 S.Ct. 1107, 1111–13, 16 L.Ed.2d 192 (1966); *Arneil v. Ramsey*, 550 F.2d 774, 779 (2d Cir.1977). Federal courts in Connecticut have traditionally drawn upon the limitations period provided in the CUSA: "No person may sue under this section [i.e., buyer's remedies] more than two years after the contract of sale...." Conn.Gen.Stat. Section 36–498(f). *See, e.g., Dandorph v. Fahnestock & Co.*, 462 F.Supp. 961, 963 (D.Conn.1979) (Burns, J.)

(law well settled in this district that two year statute applicable).[3] According to the defendants in the instant matter, it is clear from the plaintiffs' allegations that the contracts of sale in the Keystone limited partnerships were executed in May 1984 and that, therefore, the two-year limit of section 36–498(f) ran in May 1986.

Though a federal court turns to state law for reference to a limitations period on section 10(b) claims, it is federal law which determines when the period begins to run. *IIT, An Int'l Inv. Trust v. Cornfeld*, 619 F.2d 909, 929 (2d Cir.1980) ("*IIT*"); *Arneil*, 550 F.2d at 780. In this circuit, the limitations period does not commence at the time of the sale of a security but " 'when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge.' " *IIT*, 619 F.2d at 929 (quoting *Stull v. Bayard*, 561 F.2d 429, 432 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978)); *see also Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975) (limitations statute "runs from the time at which plaintiff should have discovered the general fraudulent scheme"). This gloss on the two-year requirement of section 36–498(f) has been applied by several courts in this circuit. *See, e.g., Appel v. Kidder, Peabody & Co., Inc.*, 628 F.Supp. 153, 157–58 (S.D.N.Y.1986); *Clute*, 584 F.Supp. at 1577–79; *Dandorph*, 462 F.Supp. at 964.

Before turning to the allegations of the complaint, one other principle deserves mention. In this circuit, a distinction is made between active and passive concealment of fraud when applying the equitable tolling doctrine to section 10(b) claims. "Passive concealment occurs when the defendant commits fraud but then takes no further action to disguise the fraud from the plaintiff.... [A]ctive concealment occurs when the defendant actually takes affirmative steps in addition to the original fraud to prevent plaintiff from discovering the scheme." *Clute*, 584 F.Supp. at 1578 n. 4 (quoting *McConnell v. Frank Howard Allen & Co.*, 574 F.Supp. 781, 787–88 (N.D. Cal.1983)). In a passive concealment context, equitable tolling requires both concealment and a showing by the plaintiff that he used due diligence in seeking to discover the fraud. *Clute*, 584 F.Supp. at 1578. By contrast, "where there is active concealment, a plaintiff's due diligence is irrelevant." *Id.* (citing, among other cases, *Robertson v. Seidman & Seidman*, 609 F.2d 583, 593 (2d Cir.1979) ("[T]he active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct of the opposing party."))

With these guidelines in mind, the court concludes that the allegations of the complaint, when viewed in a light most favorable to the non-movants, are sufficient to survive a Rule 12(b)(6) statute of limitations challenge to the plaintiffs' section 10(b) claim. Some movants have provided the court with documentation (e.g., letters and affidavits) which purport to demonstrate the plaintiffs' actual knowledge of the alleged fraud at times beyond the two years preceding the initiation of suit. As it must in a Rule 12(b)(6) context, the court limits itself to the four corners of the complaint and accepts as true the plaintiffs' allegations that the defendants knew or should have known, for example, of the prior litigation history of John Meatte and that they failed to reveal this history to the plaintiffs on various occasions and in various documents predating October 17, 1986. According to the plaintiffs, they did not learn of the active concealment of the purported fraud underlying the Keystone project until 1987. For purposes of Rule 12(b)(6), the complaint satisfies the two-year requirement of section 36–498(f).

The defendants present an alternative argument on the statute of limitations issue. They urge the court to forgo the *ad hoc* limitations analysis associated with federal

---

**3.** Section 36–498(f) is a successor version of the statute at issue in *Dandorph,* Conn.Gen.Stat. Section 36–346(e).

application of section 36–498(f) for the uniform rule adopted by the third circuit in *In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.) (*en banc*) ("*Data Access*"), *cert. denied sub nom. Vitiello v. I. Kahlowsky & Co.*, —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). There, the court conducted a scholarly and comprehensive review of relevant Supreme Court decisions before concluding that "the Court is sending strong signals that we should adopt a uniform limitations period in [section 10(b) and Rule 10b–5] cases rather than try to color match each case with shifting state fraud statutes of repose." *Id.* at 1545. According to the court, "since uniformity is not to be found in the diverse body of state tort limitations, we are impelled inexorably to look to federal limitations for borrowing purposes." *Id.* at 1549. The third circuit also found that lack of uniformity "inheres in the plethora of state blue sky laws, which have widely varying statutes of limitations as well as disparate statutory coverage." *Id.*

The *Data Access* court held that "the federal schema of limitations expressly set forth in the [1934 Act] 'clearly provides a closer analogy than available state statutes,' . . . and that 'the federal policies at stake [in section 10(b) and Rule 10b–5 actions] and the practicalities of litigation make [the federal] rule a significantly more appropriate vehicle. . . .'" *Id.* at 1545 (quoting *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 172, 103 S.Ct. 2281, 2294, 76 L.Ed.2d 476 (1983)). After scrutinizing different sections of the federal securities laws that are companion provisions to section 10(b), the court of appeals concluded that it would adopt the express limitations period set forth in the 1934 Act:

It is difficult to consider a limitations statute that better reflects the 'federal policies at stake' and the 'practicalities of litigation' in a case based on the [1934 Act] than those provisions of the Act that explicitly and expressly state such a period. . . . Indeed, because the Supreme Court opened the door to borrowing relevant federal limitations statutes, and in light of the congressional philosophy and purposes set forth in the 1933 and 1934

Acts that have been so consistently emphasized and implemented by the federal courts, it would seem bizarre if not anomalous to go beyond the express statutes of limitations contained in provisions of the 1934 Act.

843 F.2d at 1549. The uniform period adopted by the *Data Access* court for section 10(b) and Rule 10b–5 claims "is one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." *Id.* at 1550. With a uniform federal statute of limitations, "[a] broker in New York, an issuer in Delaware, a purchaser in San Francisco, an accountant in New Jersey, and a lawyer in Pennsylvania [would] be subject to the same statute of limitations" for actions grounded on section 10(b) or Rule 10b–5. *Id.* at 1549. According to the defendants, application of the *Data Access* three-year rule would clearly preclude the plaintiffs' section 10(b) and Rule 10b–5 claims.

As might be expected following a groundbreaking and controversial decision, *Data Access* has generated varied responses from other courts. Several district courts outside the second and third circuits have agreed with the third circuit on this issue. *See, e.g., Kayne v. PaineWebber, Inc.*, 703 F.Supp. 1334, 1343 (N.D.Ill.1989) (reasoning of the third circuit in *Data Access* is "compelling"); *Bath v. Bushkin, Gaims, Gaines and Jonas*, 695 F.Supp. 1156, 1159–62 (D.Wyo.1988) (noting that several Wyoming statutes could be applicable depending upon facts of case, court agrees with *Data Access* court that a single federal limitations period would enhance the federal interests in uniformity, certainty, and minimization of unnecessary litigation). The eleventh circuit has acknowledged *Data Access* but without discussing the third circuit opinion has continued to apply the forum state's limitations period which bears the closest resemblance to the section 10(b) claim. *Durham v. Business Management Assoc.*, 847 F.2d 1505, 1508 (11th Cir.1988). Some district courts have declined to follow *Data Access*. *See, e.g., In re Professional Fin. Manage-*

*ment, Ltd.,* 703 F.Supp. 1388, 1393 (D.Minn.1989) (adoption of the *Data Access* rule "would upset the well-settled rule in this circuit that the limitations period for section 10(b) and Rule 10b–5 claims is borrowed from the most analogous state statute"); *Marchese v. Nelson,* 700 F.Supp. 522, 523–24 (D.Utah 1988) (although *"Data Access* appears well-reasoned," "well-settled that federal courts sitting in Utah ... required to apply" state law limitation period to section 10(b) and Rule 10b–5 claims); *TCF Banking and Savings, F.A. v. Arthur Young & Co.,* 697 F.Supp. 362, 365–66 (D.Minn.1988) (in borrowing from the state limitations period, court noted "law in [e]ighth [c]ircuit is much clearer and more settled than it had been in the [t]hird [c]ircuit prior to *Data Access* "). To date only two district courts in the second circuit have published opinions on this issue; they are split on the persuasive force behind *Data Access. Compare Metropolitan Sec. v. Occidental Petroleum Corp.,* 705 F.Supp. 134, 138 (S.D.N.Y.1989) ("In light of the customary rule of this [c]ircuit, and in the absence of conflicting authority from this [c]ircuit, the six-year limitation period [under New York law] applies to" section 10(b) claims) *with Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 981 (E.D.N.Y. 1988) ("This court finds the [t]hird [c]ircuit's reasoning sound and believes it highly likely that the [s]econd [c]ircuit will follow suit.").

The *Data Access* court expressly declined to address a critical issue pertaining to its newly formulated federal limitations period for section 10(b) and Rule 10b–5 claims: whether the limitations period should have prospective effect only. 843 F.2d at 1550. Three months after *Data Access,* however, the third circuit faced this issue in *Hill v. Equitable Trust Co.,* 851 F.2d 691 (3d Cir.1988). The *Hill* court held that the third circuit's ruling in *Data Access* should be applied retrospectively. *Id.* at 698–99. The later decision relied on the three-part test set forth in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971), for deciding whether a decision has future effect only:

(1) The holding must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed;

(2) The merits and demerits in each case must be weighed by looking to the history of the rule in dispute, its purpose and effect, and whether retrospective operation will further or retard the rule's operation;

(3) Retrospective application must create the risk of producing substantially inequitable results.

After reviewing these criteria in some detail, the *Hill* court concluded that retroactive application of *Data Access* "to this case" would not be "contrary to *Chevron's* limited non-retrospectivity exception." 851 F.2d at 698.

*Hill,* like *Data Access,* has elicited its share of mixed reaction, primarily because the *Hill* court did not clearly indicate whether the *Data Access* rule should be retroactively applied in all instances. Post–*Hill* courts have agreed on the relevance of the *Chevron* test but have reached varying results after applying the criteria to the facts of specific cases. *See, e.g., Kayne,* 703 F.Supp. at 1343–44 (on basis of facts before it, court declined to give retrospective application to *Data Access* ); *Schwartz v. Philadelphia Nat'l Bank,* 701 F.Supp. 92, 97–98 (E.D.Pa.1988) (*Data Access* limitations period applied retroactively to facts before court).

The *Data Access* and *Hill* decisions raise several intriguing questions. Although the defendants have ably summarized the reasoning of the *Data Access* court, they have not fully addressed whether the decision would have a salutary or detrimental effect in this district, where it has been well settled that federal courts turn to section 36–498(f) of the Connecticut General Statutes for the limitations period applicable to section 10(b) and Rule 10b–5 claims. Moreover, the parties have not addressed the implications of *Hill* on the instant matter. The court invites further submissions on these questions, and any others the parties

deem relevant to resolution of the statute of limitations challenge to the plaintiffs' 1934 Act cause of action. Until that challenge is resolved after further briefing is completed, the court refrains from ruling on the defendants' other section 10(b) challenges. Optional simultaneous briefs shall be filed by September 11, 1989.

### B. *State Law Causes of Action*

In the interests of judicial economy the court postpones until another day consideration of the defendants' challenges to counts three, four, five, and six. The parties will not be substantially prejudiced by this delay. There being lack of complete diversity in this case, the plaintiffs have invoked the court's pendent jurisdiction over the state law claims. If, for the sake of argument, the defendants succeed in having the plaintiffs' section 10(b) claim dismissed, there will remain no federal question cause of action upon which to hang the pendent claims. Under these hypothetical circumstances, the court would decline to exercise jurisdiction over a case devoid of a federal predicate, unless presented with some compelling reason for retaining a purely non-federal suit. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well.").

### *Conclusion*

For the foregoing reasons, the court grants the defendants' Rule 12(b)(6), Fed.R. Civ.P., motions as to the plaintiffs' 1933 Act claims. The court invites further briefing on the 1934 Act claim, *see supra* section II.A.2.; all briefs shall be filed by September 11, 1989.

SO ORDERED.

### ON MOTION TO DISMISS § 10(b) AND RULE 10b–5 ACTIONS

The facts of this case are set out in this court's prior partial ruling on a motion to dismiss, see p. 468, and will be reiterated here only where necessary. In that ruling, this court reserved decision on challenges to the complaint pertaining to plaintiffs' cause of action brought pursuant to Section 10(b) of the Securities Exchange Act of 1934, ("1934 Act"), 15 U.S.C. Section 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. Section 240.10b–5. The court also requested briefing on the issues presented by these challenges.

The questions now presented are whether this court should follow the holding of *In re Data Access Sys. Sec. Litig.,* 843 F.2d 1537 (3d Cir.) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), and if so, whether that rule should apply retroactively in this case.

### I. *Application of Data Access—The Proper Statute of Limitations*

■ It is by now well documented that neither section 10(b) nor rule 10b–5 contain an express statute of limitations, presumably because the private rights of action under this legislation are creatures of the judiciary. It is equally well settled that the Supreme Court has yet to rule on the applicable limitations period for such actions. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 1389 n. 29, 47 L.Ed.2d 668 (1976). Thus, inferior Article III courts have been left to their own devices to determine the applicable statute of limitations in each district, inevitably leading to a severe lack of uniformity nationwide.

Precedent in this circuit counsels that federal courts look to analogous state law to provide the period of limitations for section 10(b) and rule 10b–5 actions. *IIT v. Cornfeld,* 619 F.2d 909, 928 (2d Cir.1980); *see also Armstrong v. McAlpin,* 699 F.2d 79, 86 (2d Cir.1983). Consequently, courts in this district have drawn upon the two year period of limitations provided by Conn.Gen.Stat. Section 36–498(f) (Connecticut Uniform Securities Act). *See, e.g., Clute v. Davenport Co.,* 584 F.Supp. 1562, 1577 (D.Conn.1984); *Dandorph v. Fahnestock & Co.,* 462 F.Supp. 961, 963 (D.Conn. 1979).

Today, this court is asked to disavow this precedent in favor of the emerging, well reasoned doctrine spawned by the *Data*

*Access* decision. While it is not the function of inferior federal courts to declare new doctrines, neither is it their function to blindly follow precedents based upon articulated premises now called into question by current Supreme Court trends. *See C.D.R. Enters., LTD. v. Bd. of Educ.,* 412 F.Supp. 1164, 1170 (E.D.N.Y.1976), *aff'd sub nom., Lefkowitz v. C.D.R. Enters., LTD.,* 429 U.S. 1031, 97 S.Ct. 721, 50 L.Ed.2d 742 (1977); *see also Quadrini v. Sikorsky Aircraft Div., United Aircraft Corp.,* 425 F.Supp. 81, 91 (D.Conn.1977) (Newman, J.). Since this court believes that the second circuit will adopt the reasoning and conclusion enunciated by the *Data Access* court, this court holds that the proper statute of limitations for claims under section 10(b) and rule 10b–5 is that statute of limitations applicable to other private rights of action under the 1934 Act—one year after the plaintiff discovers the facts constituting the violation, and in no event later than three years after such violation. *See, e.g.,* Section 9(e), 15 U.S.C. Section 78i(e) (1981).

### A. *Second Circuit Precedent*

An exhaustive discussion of the evolution of this circuit's decisions concerning the issue presented here would be neither helpful nor necessary. A survey of the second circuit's more recent decisions sufficiently illustrates the premises upon which that court has based its decisions regarding the proper period of limitations applicable to implied federal securities law claims.

In *Arneil v. Ramsey,* 550 F.2d 774 (2d Cir.1977), investors in a brokerage firm brought suit against former officers of that firm alleging, *inter alia,* violations of sections 10(b) and 20(a) of the 1934 Act. The investors claimed that the officers obtained badly needed capital without disclosing the unsound financial condition of the firm. A unanimous court reasoned that because section 10(b) did not specify a limitations period, a court must refer to the statute of limitations of the forum state to determine whether an action was timely. *Id.* at 779 (citing *UAW v. Hoosier Cardi-*

*nal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Cope v. Anderson,* 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947)).[1]

The limitations period applicable to Section 14 of the 1934 Act was discussed in *Stull v. Bayard,* 561 F.2d 429 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978). There, the plaintiff brought a suit alleging that a series of misstatements and omissions by the defendants had induced him and other shareholders of a target company not to accept a stock exchange offer. No period of limitations was prescribed for actions brought under section 14. In such situations, the court held, federal courts should apply the statute of limitations of the forum state "which best effectuate[s] the policies underlying the federal statute." *Id.* at 431 (citing *Arneil,* 550 F.2d at 779).

More recently, the second circuit again addressed the statute of limitations applicable to section 10(b) in *Armstrong v. McAlpin,* 699 F.2d 79 (2d Cir.1983) and *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980). In both cases, the court summarily found that an analogous law of the forum state supplied the appropriate statute of limitations. *Armstrong,* 699 F.2d at 86; *IIT,* 619 F.2d at 928.

A reading of these second circuit decisions indicates that the respective courts felt constrained by the weight of precedent; these decisions were obviously based upon the well established foundation of precedent which held that when Congress has been silent as to the applicable statute of limitations, courts should adopt a local, analogous statute to fill this void. *See generally UAW v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). It remains, however, whether erosion of this bedrock foundation would lead the second circuit to now reach a different result.

### B. *Erosion of the Foundation: Malley–Duff, Wilson, and DelCostello*

The foundation upon which the holdings in *Arneil, Stull, IIT,* and *Armstrong* were

---

**1.** Ostensibly feeling bound by Supreme Court precedent, the court did not proffer any addi-tional legal or policy reasons for the stated proposition.

based is enunciated in *UAW v. Hoosier Cardinal Corp.*: "Since [*Campbell v. Haverhill*, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895)], state statutes have repeatedly supplied the periods of limitations for federal causes of action when federal legislation has been silent on the question." *UAW*, 383 U.S. at 704, 86 S.Ct. at 1112 (footnote omitted). Courts have reasoned that Congress, by its silence, must have intended that state law apply, rather than having no statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158–59, 103 S.Ct. 2281, 2287–88, 76 L.Ed.2d 476 (1983).[2] The cumulative effect of three recent Supreme Court decisions, however, has called into question the efficacy of the principle's uniform application. *See Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *DelCostello*, 462 U.S. 151, 103 S.Ct. 2281.

In *DelCostello*, the question arose whether the Court should borrow a federal statute of limitations for actions against employers and unions arising under Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185 alleging breaches of a collective-bargaining agreement and of a duty of fair representation. *DelCostello*, 462 U.S. at 154–55, 103 S.Ct. at 2285–86.[3] While recognizing the generally accepted rule enunciated in *UAW*, *id.* at 159, 103 S.Ct. at 2287, the Court also noted that state limitations periods often were "unsatisfactory vehicles for the enforcement of federal law." *Id.* at 161, 103 S.Ct. at 2289. In such circumstances, "it may be inappropriate to conclude that Congress would

choose to adopt state rules at odds with the purpose or operation of federal substantive law." *Id.* Thus, in rejecting an exclusive, mechanical application of state statutes of limitation, the Court recognized "the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies." *Id.* (citations omitted). The Court held therefore that the federal limitations period applied, reasoning that

> when a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking, we have not hesitated to turn away from state law.

*Id.* at 172, 103 S.Ct. at 2294.

Building upon the foundation laid in *DelCostello*, the Supreme Court, in *Malley–Duff* and *Wilson*, adopted a three prong test to determine the appropriate limitations period for federal claims without express statutes of limitation. A court must determine: (1) whether state law or federal law governs characterization of the federal claim; (2) if federal law applies, whether all such federal claims should be characterized in the same way, or whether they should be characterized differently depending upon changing factual circumstances and legal theories; and (3) whether a federal or state statute of limitations should be used. *Malley–Duff*, 483 U.S. at 147, 107 S.Ct. at 2762; *Wilson*, 471 U.S. at 268, 105 S.Ct. at 1942.

### 1. Characterization of the Claim

■ Characterization of a federal claim for the purposes of selecting the appropri-

---

**2.** Although, it is questionable whether this reasoning applies to section 10(b) claims. As Judge Aldisert explained:

> Congress cannot be faulted for not providing a statute of limitations, because the section 10(b) private cause of action was not enacted by it; it is a genie sired solely by the judiciary, and the genie having escaped from the bottle is not easily cabined. So the courts resort to the political science fiction of formulating judicially-declared "statutes" of limitations, suggesting that this would have been the intention of Congress had it created an express cause of action. It is a sort of herma-

phroditic process: the courts invent the remedy and then seek to determine what would have been the intention of Congress as to a statute of limitations had it expressly created the private damage action.

*Data Access*, 843 F.2d at 1547. Since it is arguable whether Congress indeed intended to grant a private cause of action, it is likewise arguable that Congress intended that state law supply the proper statute of limitations.

**3.** The limitations period being considered was contained in section 10(b) of the NLRA, 29 U.S.C. Section 160(b).

ate statute of limitations is generally a question of federal law. *Malley–Duff,* 483 U.S. at 147, 107 S.Ct. at 2762; *Wilson,* 471 U.S. at 269–70, 105 S.Ct. at 1943–44; *Data Access,* 843 F.2d at 1542. A court must next address the need for, and desirability of, a uniform period of limitations. In this context, the Supreme Court itself has recognized that "[f]ew areas of law stand in greater need of firmly defined, easily applied rules than does the subject of periods of limitations.'" *Wilson,* 471 U.S. at 266, 105 S.Ct. at 1941 (quoting *Chardon v. Fumero Soto,* 462 U.S. 650, 667, 103 S.Ct. 2611, 2622, 77 L.Ed.2d 74 (1983) (Rehnquist, J., dissenting)). Nonetheless, current developments in this area have led courts and commentators alike to lament the conspicuous absence of uniformity. *See, e.g., Norris v. Wirtz,* 818 F.2d 1329, 1332 (7th Cir.) (Easterbrook, J.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987); L. Loss, *Fundamentals of Securities Regulation* 992–1003 (2d ed. 1988 & Supp.1989).

Currently, this circuit looks to the law of the forum state to determine the appropriate limitations period. In turn, that state's law often requires that a court borrow the limitations period of the law of the state where the plaintiff resides or where the cause of action accrued, frequently requiring a complex, convoluted analysis. *See, e.g., Zola v. Gordon,* 685 F.Supp. 354 (S.D. N.Y.1988). Thus, which statute applies necessarily depends upon factual circumstances. It is possible to envision, therefore, a suit by many plaintiffs, each from a different state, in which a different statute of imitations would apply to each plaintiff. *See, e.g., Kronfeld v. Advest, Inc.,* 675 F.Supp. 1449, 1457–58 & n. 21 (S.D.N.Y. 1987) (court borrowed the applicable statute of limitations for a New York plaintiff and each of the non-resident plaintiffs, applying a total of 26 statutes of limitation).[4]

Such an approach hardly promotes the "federal interests in uniformity, certainty, and the minimization of unnecessary litigation." *Wilson,* 471 U.S. at 275, 105 S.Ct. at

1947; *see also Malley–Duff,* 483 U.S. at 148, 107 S.Ct. at 2763. This approach has also led to the application of a different statute of limitations by the district courts in each of the states comprising this circuit. *See, e.g., Metropolitan Sec. v. Occidental Petroleum Corp.,* 705 F.Supp. 134, 138 (S.D.N.Y.1989) (New York's statute of limitations applied); *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1577 (D.Conn.1984) (Connecticut's statute of limitations applied); *Bartels v. Algonquin Properties, Ltd.,* 471 F.Supp. 1132, 1147 (D.Vt.1979) (Vermont's statute of limitations applied). Further disparate results would occur within this circuit if district courts within the same state disagreed as to the proper period of limitations, that is, disagreed as to which state claim is most analogous to a section 10(b) action.

The phenomena discussed invariably encourage plaintiffs to file strike suits for claims which may be stale or groundless. Forum shopping, a long disfavored practice, *see Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 74–77, 58 S.Ct. 817, 820–22, 82 L.Ed. 1188 (1938), has also ensued from the lack of uniformity, and there is little reason to believe that it will not continue to flourish. Residents of various states are granted different degrees of protection under federal causes of action based solely upon where they live or where their claims accrued. Surely this was not the intent of Congress. *Cf. Wilson,* 471 U.S. at 274–75, 105 S.Ct. at 1945–47 ("[U]nder such an approach different statutes of limitations would be applied to the various section 1983 claims arising in the same State, and multiple periods of limitations would often apply to the same case.... Congress would [not] have sanctioned this interpretation of its statute."). For reasons similar to those expressed in *Malley–Duff, Wilson, DelCostello,* and *Data Access,* therefore, this court finds that all claims arising under section 10(b) should be characterized in the same way.

---

**4.** Such cases have been deemed a *reductio ad absurdum* argument for the application of a uniform limitations period. *See* L. Loss, *Funda-*

*mentals of Securities Regulation* 994–95 (2d ed. 1988 & Supp.1989).

## 2. The Appropriate Choice of Law: Federal or State Periods of Limitation

The next inquiry this court must conduct is whether a federal or state statute of limitations should be borrowed. The *Del-Costello* Court explained that when a federal statute does not contain a limitations period, the Court has generally concluded that "Congress intended that the courts apply the most closely analogous statute of limitations under state law." 462 U.S. at 158, 103 S.Ct. at 2287. As mentioned, this reasoning may not apply with full force to Section 10(b) actions. *See supra* footnote 2. Moreover, precedent establishes that " 'the silence of Congress is not to be read as automatically putting an imprimatur on state law. Rather, state law is applied only because it supplements and fulfills federal policy, and the ultimate question is what federal policy requires.' " *Wilson*, 471 U.S. at 271 n. 20, 105 S.Ct. at 1944 n. 20 (quoting *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 709, 86 S.Ct. 1107, 1115, 16 L.Ed.2d 192 (1966) (White, J., dissenting)).

Although it has been suggested that an analogous state statute of limitations should always be borrowed when a federal statute contains no period of limitations, "a clear majority of the Court [has] rejected such a single path." *Malley–Duff*, 483 U.S. at 146, 107 S.Ct. at 2762 (citing *Del-Costello*, 462 U.S. at 158–59, 103 S.Ct. at 2287–88). Instead, courts are instructed to borrow the statute of limitations from a rule which provides the closest analogy to the implied cause of action. *Malley–Duff*, 483 U.S. at 150, 107 S.Ct. at 2764; *DelCostello*, 462 U.S. at 172, 103 S.Ct. at 2294; *Data Access*, 843 F.2d at 1548. Thus, "when the federal policies at stake and the practicalities of litigation make [a federal] rule a significantly more appropriate vehicle for interstitial lawmaking," *DelCostello*, 462 U.S. at 172, 103 S.Ct. at 2294; see also *Malley–Duff*, 483 U.S. at 153, 107 S.Ct. at 2765; *Data Access*, 843 F.2d at 1548, courts should borrow the federal limitations period. This court finds that Section 10(b) bears "a far closer analogy to [companion provisions in the 1934 Act] than any state alternative." *Malley–Duff*, 483 U.S. at 150, 107 S.Ct. at 2764; *see also Data Access*, 843 F.2d at 1548.

Section 10(b) and its companion provisions are all aimed at the same objectives: "to 'provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof....' " *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 728, 95 S.Ct. 1917, 1921, 44 L.Ed.2d 539 (1975) (quoting the 1933 Act). Moreover, all of these provisions, except 16(b), contain a uniform federal limitations period—one year from the date of discovery of the fraud and no greater than three years from the date of such violation. This court finds that this limitations period reflects "the balance that Congress would have preferred between the substantive policies underlying the federal claim and the policies of repose." *Wilson*, 471 U.S. at 270, 105 S.Ct. at 1944. As Judge Easterbrook so eloquently explained, "[t]he legislative history [of the 1934 Act] makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year rule was to be absolute." *Norris v. Wirtz*, 818 F.2d 1329, 1332 (7th Cir.1987) (citing H.R.Conf. Rep. No. 1838, 73d Cong., 2d Sess. 32, 36, 42 (1934); 78 Cong.Rec. 8198–8203 (May 7, 1934); 6 J.S. Ellenberger & P. Mahar, *Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934* 6565–66, 6718, 6993 (1973)). Furthermore, the American Bar Association Task Force on the Statute of Limitations for Implied Causes of Actions unequivocally concluded that "Congress did not intend equitable tolling to apply in actions under the securities laws." *Report of the Task Force on Statute of Limitations for Implied Actions*, 41 Bus.Law. 645, 655 (1986).

Logic also dictates reference to the limitations periods expressly provided by the 1934 Act. As one eminent scholar reasoned:

[W]ith the 1933 and 1934 Acts so closely related, why not look to *their* statutes of limitations by way of analogy rather than to a variant state law? Would it

not be eminently more consistent with the overall statutory scheme to look to what Congress itself did when it was thinking specifically of private actions in securities cases rather than to a grabbag of more or less analogous state statutes?

L. Loss, *Fundamentals of Securities Regulation* 995 (2d ed. 1988). In this context, any analogy to state law is bound to be imperfect. *Wilson*, 471 U.S. at 273, 105 S.Ct. at 1945.

The facts of this case painfully illustrate how absorption of state statutes of limitation frustrates Congressional intent and the schema of federal securities law. Here, plaintiffs purchased securities in May 1984. However, they did not file this action until October 1988. Under the two year limitation period provided by Conn. Gen.Stat. Section 36–498(f), plaintiffs claim would be time barred in May 1986. The plaintiffs allege, however, that they did not discover the fraud until early 1987. Thus, equitable tolling of the statute would allow the plaintiffs to bring this suit nearly four and a half years after the alleged fraud. Such a result would clearly countermand Congressional intent and would be contrary to the federal schema of limitations expressly set forth in the 1934 Act.

Courts' responses to the *Data Access* opinion have been diverse. *See* p. 468. While a district court within this circuit has embraced the *Data Access* holding, *see Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. 962, 981 (E.D.N.Y.1988) (*Data Access* court's reasoning sound, highly likely that second circuit will follow suit), other courts have declined to take that step. *See, e.g., Huang v. Sentinel Gov't Sec.,* 709 F.Supp. 1290, 1301 n. 10 (S.D.N.Y.1989) (clear law in this circuit dictates application of analogous state limitations statute); *Metropolitan Sec. v. Occidental Petroleum Corp.,* 705 F.Supp. 134, 138 (S.D.N.Y. 1989) (In light of customary rule in this circuit, and absence of conflicting authority from circuit, analogous state limitations statute applies).

Courts declining to adopt *Data Access* have almost exclusively done so on the basis of existing contrary precedent. *See, e.g., Huang,* 709 F.Supp. at 1301 n. 10. In *Eickhorst v. Am. Completion and Dev. Corp.,* 706 F.Supp. 1087 (S.D.N.Y.1989), however, the district court concluded that the reasoning of *Data Access* was inapplicable in this circuit, and, in any event, that *Malley–Duff* did not compel the result reached in *Data Access. Id.* at 1102. The *Eickhorst* court found that, unlike the third circuit, the law in this circuit regarding the applicable limitations period in section 10(b) actions was clear. *Id.* at 1100. This argument misses its mark, however. While it is true that the law of the third circuit was confused in this area, it was the factually and legally based inquiries themselves which the *Data Access* court eschewed. In this circuit, such inquiries, that is, inquiries concerning the residency of the plaintiff(s) and where the 10(b) claim accrued, are still necessary under the currently applied analysis. Moreover, the desire to promote "federal interests in uniformity, certainty, and minimization of unnecessary litigation," *Wilson,* 471 U.S. at 275, 105 S.Ct. at 1947, and to prevent frustration or interference with the implementation of important federal policies, *DelCostello,* 462 U.S. at 162, 103 S.Ct. at 2289, were at the heart of the *Data Access* decision. These concerns are implicated even when the law within a particular circuit is well settled.

The *Eickhorst* court also found that the differences between RICO claims, at issue in *Malley–Duff,* and section 10(b) claims sufficiently undermined the persuasive value of Malley–Duff; "Malley–Duff does not *compel* a departure from the longstanding practice in this Circuit." *Id.* at 1102 (emphasis added). While *Malley–Duff* alone may not compel the result this court reaches today, surely the cumulative effect of *Malley–Duff, Wilson,* and *DelCostello* suggests an alternative path. Although this trilogy does not obliterate the foundation of precedent upon which this circuit's analysis is presently based, surely it disturbs its moorings. This court therefore finds the distinctions asserted in *Eickhorst* unpersuasive.

A recent second circuit decision may sound in harmony with the decision reached today. In *Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990), the court addressed the problem of setoff in a section 10(b) context. The question presented was whether in a 10b–5 cause of action the federal securities laws incorporate the state law of setoff or require a uniform federal rule of setoff. *Id.* at 599. The Court reasoned that:

> [A]doption of state statutes governing credit for settlement would lead to disparate results in cases in which (1) the state statutes differed or (2) state interpretation of similarly worded statutes differed. Because most securities fraud actions involve multiple parties from various states and in many cases at least some of the defendants settle, the incentive to forum-shop for favorable state rules would be heightened in many cases.

*Id.* at 600.[5] The Court held therefore that a uniform federal rule was appropriate in this context.

For the foregoing reasons, as well as the reasons stated by the third circuit in *Data Access*, this court finds that the appropriate limitations period for section 10(b) actions is that period contained in sister provisions of the 1934 Act—one year from the date the fraud is discovered, and in no event later than three years from the date of such violation.

## II. *Retroactive Application of the Data Access Doctrine*

Since this court has determined that the rule in *Data Access* will be adopted by the second circuit, it must now discern whether that rule should be applied retroactively in this case.

It has long been recognized that as a general rule, judicial precedents normally have retroactive as well as prospective effect. *Thorpe v. Hous. Auth.*, 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474

(1969); *Byrne v. Buffalo Creek R.R. Co.*, 765 F.2d 364, 366 (2d Cir.1985); *Kremer v. Chemical Constr. Corp.*, 623 F.2d 786, 788 (2d Cir.1980), *aff'd*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Only in exceptional circumstances will a court stray from this path. *See, e.g., Byrne*, 765 F.2d at 366 (considering large amount of time and money invested in case, and that suit was commenced eight years before decision changing applicable statute of limitations, suit not time barred). In the seminal case on this subject, *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court fashioned a three part test to determine whether a decision should be applied only prospectively:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its application." Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

*Id.* at 106–07, 92 S.Ct. at 355–56 (citations omitted).

Subsequent decisions have established that each of these factors must be satisfied or the decision will be applied retroactively. *See Holzsager v. Valley Hosp.*, 646 F.2d 792, 797–98 (2d Cir.1981); *Kremer*, 623 F.2d at 789–90. Moreover, the party opposing retroactive application bears the burden of satisfying the *Chevron* test. *Cash v. Califano*, 621 F.2d 626, 629 (4th

---

5. The court also noted that setoff affected substantive rights. The court commented that most circuits have, in securities actions, incorporated state statutes for procedural matters, such as statutes of limitations. (The court also noted

that *Data Access* had challenged this doctrine.) Since the adoption of setoff governs substantive rights, the court found this doctrine inapplicable. *Singer,* 878 F.2d at 599–600.

Cir.1980); *Harpp v. General Elec. Co.*, 571 F.Supp. 426, 432 (N.D.N.Y.1983). For the reasons stated below, this court finds that the plaintiff has failed to meet this burden.

In examining the first prong of the *Chevron* inquiry, prior precedent must have been sufficiently well settled that a plaintiff " 'could have reasonably relied upon it in delaying suit.' " *Hill v. Equitable Trust Co.*, 851 F.2d 691, 696 (3d Cir.1988) (citation omitted), *cert. denied,* —— U.S. ——, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989). Thus, a court must examine the state of the law both at the time which the plaintiff should have discovered the suit and the date on which the suit was filed. *Id.* at 697; *Heineman v. S & S Mach. Co.*, 707 F.Supp. 86, 90 (E.D.N.Y.1989).

The sale of the securities in question took place on May 25, 1984. Plaintiffs allege that defendants' violations of the securities laws also began that day. Plaintiffs' Complaint para. 36. It is also alleged, however, that some of the plaintiffs did not discover these violations until approximately March 1987. *Id.* paras. 29–30. Yet the plaintiffs' suit was not commenced until October 17, 1988.

At the time the violations were discovered, March 1987, the law in this circuit mandated that an *analogous* law of the forum state supply the appropriate period of limitations in a section 10(b) action. *See IIT v. Cornfeld*, 619 F.2d 909 (2d Cir.1980). Likewise, it was settled in this district that Conn.Gen.Stat. Section 36–498(f) supplied the most analogous state law. *See Clute v. Davenport*, 584 F.Supp. 1562 (D.Conn. 1984). It is noteworthy, however, that the second circuit has never confirmed that section 36–498(f) is indeed the most analogous state law, although it has made similar determinations for districts courts in other states. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 86 (2d Cir.1983) (appropriate limitations period for federal securities law action brought in New York districts courts is New York State's limitation period for common law fraud). Absolute reliance on section 36–498(f) as the definitive, analogous state law in this district may therefore have been unwise.

Further, three Supreme Court decisions which shook the foundation of this circuit's precedent, *Malley–Duff* (decided April 1987), *Wilson* (decided April 1985), and *Del-Costello* (decided June 1983), were all decided before the plaintiffs commenced their suit and before the three year statute of repose had expired on May 25, 1987. This should have caused a reasonably prudent attorney to at least question the value of precedent in this district.

■ Finally, if the two year limitations period of Conn.Gen.Stat. Section 36–498(f) were woodenly applied, plaintiffs' action would have been time barred after May 1986. However, because federal law determines when the period begins to run, *Armstrong*, 699 F.2d at 86, the action did not accrue until the plaintiffs knew or had reason to know a fraud occurred. *IIT*, 619 F.2d at 929. Thus, plaintiffs' cause of action would not be time barred since this court found that they first learned of the frauds sometime in 1987. But hindsight is twenty-twenty. Plaintiffs could not have reasonably relied on the fact that this court would so hold. Although application of federal law to toll the state statute was almost certain, exactly when this court would deem the cause of action to have accrued was not. *See Armstrong*, 699 F.2d at 88 (since plaintiffs could have discovered fraud more than two years prior to commencement of their action, 10(b) claim was time barred as to conduct before that date). Plaintiffs nonetheless waited more than a year and a half after they discovered the fraud before filing this suit. It is not altogether clear, then, that plaintiffs' reliance, if any, was reasonable. Even conceding plaintiffs the first criterion, however, plaintiffs fail to meet *Chevron*'s other two conditions.

Courts have generally found that resolution of the second Chevron criterion— whether retrospective operation would further or retard the rule's application—is neutral. *See, e.g., Hill*, 851 F.2d at 698. As such, plaintiffs have not met their burden. But they fail this prong for another reason. Plaintiffs have offered no persuasive argument why the purposes of the

Securities Act would be retarded by retroactive application of the rule in *Data Access.* Arguably, barring plaintiffs' claim at this juncture frustrates the "broad remedial purpose behind the Securities Exchange Act of 1934." *Heineman,* 707 F.Supp. at 91. It is clear, however, that the three year statute of repose struck the balance between this concern and the "fear that lingering liabilities would disrupt normal business and facilitate false claims." *Norris v. Wirtz,* 818 F.2d 1329, 1332 (7th Cir. 1987) (Easterbrook, J.). Allowing plaintiffs to maintain a suit more than a year and a half after the statute of repose has expired would frustrate not only the rule in *Data Access,* but the schema of the 1934 Act as well. Plaintiffs therefore fail the second prong of *Chevron.*

■ Lastly, this court must weigh the inequity imposed by retroactive application of the *Data Access* rule. Plaintiffs beg the question by asserting that retroactive application of this rule is inequitable because it would operate to bar their suit. It is clear that the untimeliness of the plaintiffs' own actions can weigh into the equities. *Garguil v. Tompkins,* 790 F.2d 265, 274 (2d Cir.1986). Here, plaintiffs' inaction played a "prominent role in using up the limitations period." *Holzsager,* 646 F.2d at 798. They filed suit nearly four and a half years after the alleged fraud occurred. Moreover, at the time they discovered the fraud, their claim was already nearly three years old. Plaintiffs nevertheless waited another year and a half before filing suit. Such laxity demonstrates both the plaintiffs' lack of reliance on *any* statute and their willingness to expose themselves to substantial risk of losing their claims.

On the other hand, inequity to the defendants must also be considered in this context. *Stanulonis v. Marzec,* 649 F.Supp. 1536, 1542 (D.Conn.1986) (Dorsey, J.). Statutes of repose are "designed to deal with the problems of proof—and the invitation to file claims easier to advance than refute—that arise if long delayed litigation is permissible." *Norris,* 818 F.2d at 1333. Indeed, the Supreme Court itself has stated that:

The statute of limitations is a statute of repose, designed to protect the citizens from stale and vexatious claims, and to make an end to the possibility of litigation after the lapse of a reasonable time. It has long been regarded by this Court ... as a meritorious defense, in itself serving a public interest.

*Guaranty Trust Co. v. United States,* 304 U.S. 126, 136, 58 S.Ct. 785, 790, 82 L.Ed. 1224 (1938). This court finds that a weighing of the equities tips the scale in favor of the defendants; retroactive application of this ruling would not produce "substantial inequitable results." *Chevron,* 404 U.S. at 107, 92 S.Ct. at 355.

### *Conclusion*

For the foregoing reasons, the court grants the defendants motion to dismiss the federal securities fraud claims.

SO ORDERED.